IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No.: 25-11837 |
| RAS DATA SERVICES, INC., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Hon. Judge Michael B. Slade |
| _____ | ) | |
| | ) | |
| INFINITY TRANSPORTATION 2024, LLC; | ) | |
| INFINITY TRANSPORTATION 2023, LLC | ) | |
| INFINITY TRANSPORTATION 2022, LLC; | ) | |
| INFINITY TRANSPORTATION 2020-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2020-2, LLC | ) | |
| INFINITY TRANSPORTATION 2019-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2019-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2018-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2018-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2016-1, LLC; | ) | |
| INFINITY TRANSPORTATION III, LLC; | ) | |
| INFINITY RAIL CANANA PORTFOLIO 6 ULC; | ) | |
| INFINITY RAIL CANADA PORTFOLIO 7 ULC; | ) | |
| ARC RAIL 2013-1, LLC; | ) | |
| ARC RAIL CANADA FOUR, ULC; | ) | |
| ARC RAIL CANADA SUB ONE, ULC; | ) | |
| ARC RAIL CANADA TWO, ULC; | ) | |
| ARC RAIL CANADA FIVE, ULC; | ) | |
| ARC RAIL CANADA THREE, ULC; and | ) | |
| INFINITY TRANSPORTATION | ) | |
| EQUIPMENT LEASING, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 25-00244 |
| v. | ) | |
| | ) | |
| RAS DATA SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**APPLICATION TO SET HEARING ON EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Infinity Transportation 2024, LLC, Infinity Transportation 2023, LLC, Infinity Transportation 2022, LLC, Infinity Transportation 2020-1, LLC, Infinity Transportation 2020-2, LLC, Infinity Transportation 2019-1, LLC, Infinity Transportation 2019-2, LLC, Infinity Transportation 2018-1, LLC, Infinity Transportation 2018-2, LLC, Infinity Transportation 2016-1, LLC, Infinity Transportation III, LLC, ARC Rail 2013-1 (the foregoing entities collectively, the "*Infinity Owners*"), Infinity Rail Canada Portfolio 6 ULC, Infinity Rail Canada Portfolio 7 ULC, LLC, ARC Rail Canada Four, ULC, ARC Rail Canada Sub One, ULC, ARC Rail Canada Two, ULC, ARC Rail Canada Five, ULC, ARC Rail Canada Three, ULC (the foregoing entities collectively, the "*Infinity Canada Owners*") and Infinity Transportation Equipment Leasing, LLC ("*ITEL*" and together with the Infinity Owners and the Infinity Canada Owners, the "*Plaintiffs*"), by and through their attorneys Smith Gambrell & Russell, LLP, hereby moves this Court (the "*Application*") for entry of an order pursuant to Local Rule 9013-2, setting a hearing on an emergency basis for the *Emergency Motion for Temporary Restraining Order and Preliminary Injunction* (the "*Motion*").  In support of the Application, the Plaintiffs state as follows:

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334, and the Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

2.       Venue of the Bankruptcy Case and of this Application are proper in this Judicial District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       Consideration of this Application is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

4.       The predicate for the relief requested herein is Local Rule 9013-2.

SGR/80686188.1

## BACKGROUND

5.     On August 1, 2025 (the "*Petition Date*"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Northern District of Illinois (the "*Court*").

6.      The Debtor is a third-party administrator that provides railcar billing and collections management services to the rail industry, including, but not limited to, billing services, collection and remittance of certain funds on its customers' behalf, repair billing, auditing, accounting, reporting, budgeting and analysis.

7.     The Infinity Owners and Infinity Canada Owners (together, the "*Infinity Lessors*") collectively own and lease approximately 47,000 railcars throughout North America.

8.     At all relevant times the Debtor served as agent of the Plaintiffs with respect to the billing and collection services pursuant to a Management Services Agreement (the "*Services Agreement*") dated December 30, 2021 that is summarized in the Motion.

9.     Pursuant to the Services Agreement and as more fully described in the Motion, the Debtor is currently holding millions of dollars as agent for the Plaintiffs. Accordingly, these funds are not property of the estate, but rather are property of the Plaintiffs that the Debtor is in possession of as of the Petition Date.

10.     These funds consist of three types:

   a.     <u>Rebuttal Billing Payments and Additional Rebuttal Billing Payments</u>: With respect to amounts billed to the Plaintiffs' lessees of the railcars, the Debtor serves as the Plaintiffs' collection agent. The Debtor is currently holding $2,064,295.00 of Rebuttal Billing Payments for the month ended June 30, 2025 that belong to the Plaintiffs. Upon information and belief, the Debtor also collected an additional $1.1 million in Additional Rebuttal Billing Payments from railcar lessees between June 30, 2025 and the Petition Date, which was not remitted to the Plaintiffs.

   b.     <u>Car Hire Fees</u>: The Debtor also serves as a transfer agent for the collection and remittance to the Infinity Lessors of car hire revenue, which comprises

3

usage fees that railroads owe to the Infinity Lessors for time and distance that certain Infinity Lessor railcars spend on the railroads' tracks. The Debtor is currently holding approximately $225,000.00 of Car Hire Fees that belong to the Plaintiffs.

c.    <u>Vendor Repair Advance</u>: With respect to railcar repair amounts that the Plaintiffs are responsible for paying for, the Plaintiffs transferred funds to the Debtor, which funds are earmarked for direct transfer by the Debtor to the repair vendors who performed work on the Infinity Lessors' railcars. The Debtor is currently holding $5,356,667.19 of the Plaintiffs' Vendor Repair Advance.

11.    Accordingly, the Debtor is currently holding $8,745,962.19 that belongs to the Plaintiffs (the "*Plaintiffs' Property*") and is not property of the Debtor's estate.

12.    Contemporaneously herewith, the Plaintiffs have filed an adversary complaint seeking a declaration that the Plaintiffs' Property are funds held by the Debtor as their agent and are not property of the estate pursuant to section 541(d) of the Bankruptcy Code. In addition, pursuant to the Motion, the Plaintiffs seek entry of a TRO and a preliminary injunction, preventing the Debtor from using, transferring or withdrawing any of those funds pending final adjudication of the Plaintiffs' complaint.

**RELIEF REQUESTED**

13.    The Plaintiffs seek entry of an order scheduling a hearing before Judge Thorne (as Emergency Judge) on an emergency basis on the Motion on August 6, 2025, at 11:00 a.m., or as soon thereafter as the Plaintiffs may be heard pursuant to Local Rule 9013-2.

14.    Pursuant to Local Rule 9013-2(B)(2), a copy of the Motion is attached hereto as **<u>Exhibit 1</u>**.

**BASIS FOR RELIEF**

15.    Local Rule 9013-2 provides that "[a] motion may be heard on an emergency basis only if it: (1) arises from an occurrence that could not reasonably have been foreseen; and (2) requires immediate action to avoid serious and irreparable harm." Local Rule 9013-2(A).

4

16.    Pursuant to Local Rule 9013-2(B), this Application must state "(a) the reasons why the motion should be heard on an emergency basis; and (b) the proposed date and time for the motion's presentment." Local Rule 9013-2(B). The Application must also attach the proposed emergency motion (which is attached hereto as Exhibit 1) but need not be served or noticed for presentment and need not include a proposed order. *Id.*

17.    The Plaintiffs submit that the relief requested in the Motion is necessary on an emergency basis because if the Debtor spends or otherwise distributes the Plaintiffs' Property, the Plaintiffs will have no adequate remedy at law. A money judgment against a bankrupt debtor will do the Plaintiffs no good if the Debtor has spent the Plaintiffs' Property prior to adjudication of the Plaintiffs' complaint.

18.    Once the Debtor spends or otherwise distributes the Plaintiffs' Property to the Debtor's other creditors, the Plaintiffs will be left with only an unsecured claim against an insolvent bankruptcy estate and the Plaintiffs will have to pay *another* $5.3 million to its vendors, which funds will have been misappropriated to unjustly enrich the Debtor and the Debtor's other creditors.

19.    It is critical that the Motion be heard as soon as possible so that the Court can enter a TRO and a preliminary injunction before the Debtor uses, transfers or withdraws funds that belong to the Plaintiffs.

20.    If the Debtor uses, transfers or withdraws the funds before the Motion is heard, then the very thing the TRO and preliminary injunction is meant to prevent will have already happened and the Plaintiffs will be irreparably harmed.

SGR/80686188.1

21.     In addition, the Plaintiffs could not have filed the Motion any earlier due to the fact that the Petition Date just occurred.  Indeed, the complaint, Motion and this Application were filed quickly upon the filing of the Debtor's chapter 11 petition.

22.     Accordingly, for the reasons set forth herein and as more fully set forth in the Motion, the Plaintiffs request that this Court set a hearing before Judge Thorne as Emergency Judge on the Motion on August 6, 2025, at 11:00 a.m., or as soon thereafter as the Plaintiffs may be heard.

**WHEREFORE**, the Plaintiffs respectfully request that the Court expedite the hearing on the Motion to August 6, 2025, at 11:00 a.m., and grant such other and further relief as is necessary or appropriate.

Dated:  August 4, 2025                              Respectfully submitted,

                                                   **INFINITY TRANSPORTATION 20224, LLC**,
                                                   *et al.*,

                                                   By: */s/ Michael K. Desmond*

Shelly A. DeRousse (Atty. No. 6274798)
Michael K. Desmond (Atty. No. 6208809)
Elizabeth L. Janczak (Atty. No. 6302864)
Shira R. Isenberg (Atty. No. 6279718)
SMITH, GAMBRELL & RUSSELL, LLP
311 South Wacker Dr., Suite 3000
Chicago, Illinois 60606
Telephone: (312) 360-6000
Facsimile: (312) 360-6520
sderousse@sgrlaw.com
mdesmond@sgrlaw.com
ejanczak@sgrlaw.com
sisenberg@sgrlaw.com

SGR/80686188.1

# Exhibit 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No.: 25-11837 |
| RAS DATA SERVICES, INC., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Hon. Michael B. Slade |
| _____ | ) | |
| | ) | |
| INFINITY TRANSPORTATION 2024, LLC; | ) | |
| INFINITY TRANSPORTATION 2023, LLC | ) | |
| INFINITY TRANSPORTATION 2022, LLC; | ) | |
| INFINITY TRANSPORTATION 2020-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2020-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2019-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2019-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2018-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2018-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2016-1, LLC; | ) | |
| INFINITY TRANSPORTATION III LLC; | ) | |
| INFINITY RAIL CANANA PORTFOLIO 6 ULC; | ) | |
| INFINITY RAIL CANADA PORTFOLIO 7 ULC; | ) | |
| ARC RAIL 2013-1, LLC; | ) | |
| ARC RAIL CANADA FOUR, ULC; | ) | |
| ARC RAIL CANADA SUB ONE, ULC; | ) | |
| ARC RAIL CANADA TWO, ULC; | ) | |
| ARC RAIL CANADA FIVE, ULC; | ) | |
| ARC RAIL CANADA THREE, ULC; and | ) | |
| INFINITY TRANSPORTATION | ) | |
| EQUIPMENT LEASING, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 25-00244 |
| v. | ) | |
| | ) | |
| RAS DATA SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

SGR/80714422.2

Infinity Transportation 2024, LLC, Infinity Transportation 2023, LLC, Infinity Transportation 2022, LLC, Infinity Transportation 2020-1, LLC, Infinity Transportation 2020-2, LLC, Infinity Transportation 2019-1, LLC, Infinity Transportation 2019-2, LLC, Infinity Transportation 2018-1, LLC, Infinity Transportation 2018-2, LLC,  Infinity Transportation 2016-1, LLC, Infinity Transportation III, LLC, ARC Rail 2013-1, LLC (the foregoing entities collectively, the "*Infinity Owners*"), Infinity Rail Canada Portfolio 6 ULC, Infinity Rail Canada Portfolio 7 ULC, ARC Rail Canada Four, ULC, ARC Rail Canada Sub One, ULC, ARC Rail Canada Two, ULC, ARC Rail Canada Five, ULC, ARC Rail Canada Three, ULC (the foregoing entities collectively, the "*Infinity Canada Owners*") and Infinity Transportation Equipment Leasing, LLC, ("*ITEL*" and together with the Infinity Owners and the Infinity Canada Owners, the "*Plaintiffs*" or "*Infinity Lessors*"), by and through their attorneys Smith Gambrell & Russell, LLP, hereby submits this Emergency Motion for Temporary Restraining Order ("*TRO*") and Preliminary Injunction (the "*Motion*") against RAS Data Services, Inc. (the "*Debtor*" or the "*Defendant*").  In support of the Motion, Plaintiffs state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

2.      Venue of the Bankruptcy Case and of this Motion are proper in this Judicial District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      Consideration of this Motion is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

2

4.      The predicates for the relief requested herein are Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rule 65 of the Federal Rules of Civil Procedure (the "*Federal Rules*").

## BACKGROUND FACTS

5.      On August 1, 2025 (the "*Petition Date*"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "*Bankruptcy Court*"), thereby commencing the above-captioned case and creating the Debtor's estate (the "*Estate*").

6.      The Debtor is a third-party administrator that provides railcar billing and collections management services to the rail industry, including, but not limited to, billing services, collection and remittance of certain funds on its customers' behalf, repair billing, auditing, accounting, reporting, budgeting and analysis.

7.      On information and belief, at all relevant times the Debtor was owned and controlled by Michael L. Calomino, who served as President and CEO.

## Management Services Agreement

8.      The Infinity Owners and Infinity Canada Owners (together, the "*Infinity Lessors*") collectively own and lease approximately 47,000 railcars throughout North America. (Declaration of Jonathan Kantor ¶ 2, attached hereto (the "*Kantor Decl.*").)

9.      At all relevant times the Debtor served as agent of the Infinity Lessors with respect to the billing and collection services summarized herein.

10.     The Debtor is not a repair shop and performs no actual repair services for the Infinity Lessors, however the Debtor performs other important services for the Infinity Lessors.

3

First, the Debtor serves as a collection agent for repair billings commonly referred to as "Rebuttal Billing," which is billing to railcar lessees seeking reimbursement for repair and maintenance costs that are allocated to them under their leases with the Infinity Lessors.  (*Id.* at ¶ 6.)

11.     Second, the Debtor serves as a transfer agent through which payments are made by the Infinity Lessors to vendors who actually perform railcar repair services.  Those payments are advanced by the Infinity Lessors to the Debtor, as its agent, and earmarked for payment to the specific vendors.  (*Id.* at ¶ 7.)

12.     Third, the Debtor serves as a transfer agent for the collection and remittance to the Infinity Lessors of certain car hire revenue (the "*Car Hire Fees*"), which comprises usage fees that railroads owe to the Infinity Lessors for time and distance that certain Infinity Lessor railcars spend on the railroads' tracks.  (*Id.* at ¶¶ 15-16.)

13.     On or about December 30, 2021, certain of the Infinity Lessors entered into a Management Services Agreement with the Debtor to provide the services described therein as summarized in the Complaint (the "*Services Agreement*").  The Services Agreement has a four-year term, which will expire on December 31, 2025.  A true and correct copy of the Services Agreement is attached hereto as **Exhibit 1**.  (Kantor Decl. ¶ 3.)

14.     The terms and provisions of the Services Agreement are governed by Illinois law. (Ex. 1 ¶ 16.)

15.     The express terms of the Services Agreement contemplate that when new "Infinity Transportation" entities come into being and require the Debtor's services, each new entity executes a joinder with respect to the Services Agreement.  In reality, however, the Debtor and "Infinity Transportation" entities formed since 2021 have engaged in a course of dealing that

4

accepts and treats the new entities as paying customers of the Debtor's services without their executing formal joinders.

16.     Paragraph 3 of the Services Agreement provides as follows:

**(3) AGENT FOR RECEIPT OF RAILROAD BILLING**

RAS and each Railcar Owner (solely for itself and its railcars) will be jointly responsible for updating industry publications such that RAS will receive all maintenance billing directly from repairing railroads. Subsequent to pre-payment audit and approval based on Association of American Railroads rules and Generally Accepted Accounting Principles, RAS will render payment to railroads on behalf of each Railcar Owner. RAS will generate and distribute all necessary billing disputes to appropriate vendors on behalf of each Railcar Owner. At the close of each accounting period, RAS will submit an invoice to each applicable Railcar Owner with sufficient documentation so that the Railcar Owner will reimburse RAS in full for maintenance, management, and related charges on a maximum net fourteen (14) day payment schedule.

(Kantor Decl. ¶ 4.)

17.     Notwithstanding the provisions of paragraph 3 of the Services Agreement, the Debtor renders no payment to railroads and repair vendors on behalf of the Infinity Lessors unless and until the Infinity Lessors transfer sufficient funds to the Debtor in advance – referred to as vendor repair advances – which are specifically earmarked for payment to such vendors for specific repair services. (*Id.* ¶ 5.)

18.     As set forth above, the Debtor also serves as a collection agent of the Infinity Lessors for repair billings to railcar lessees, which is commonly known as Rebuttal Billing. (*Id.* ¶ 6.) Specifically, the Debtor receives repair data from repair vendors, processes that data to generate invoices to the Infinity Lessors and to the lessees, as agent for the Infinity Lessors, for the items for which each bear responsibility (*Id.* ¶ 8.) The Debtor then collects the money from the Infinity Lessors and lessees and passes that money on to the applicable ultimate recipients. (*Id.* ¶ 9.) An example of Rebuttal Billing issued by the Debtor on behalf of the Infinity Lessors is

5

attached hereto as **Exhibit 2**.  The invoice clearly reflects that the payment is to be remitted to the Debtor "as agent for Infinity Transportation."  (Kantor Decl. ¶ 10.)

19.      Funds collected by the Debtor on behalf of the Infinity Lessors are supposed to be remitted to the Infinity Lessors on at least a monthly basis.  (*Id.* ¶ 11.)

20.      Pursuant to Paragraph 8 of the Services Agreement, the Debtor receives a monthly management fee of $16,350.00, plus an additional fee per railcar over 10,000 railcars, pursuant to the rate schedule in the Services Agreement. *See* Ex. 1 at ¶ 8.  The management fees are not a commission or percentage-fee related to the amount or flow of the Infinity Lessors' money through the Debtor as a mere conduit.  The Debtor earns its fee strictly based on the number of Infinity Lessor railcars that are relevant to the Debtor's services.

**Recent Transactions**

21.      For the month ended June 30, 2025, the Debtor collected approximately $2,064,295.00 in payments from railcar lessees as agent for the Infinity Lessors with respect to Rebuttal Billing (the "*Rebuttal Billing Payments*").  *See* **Exhibit 3**, attached hereto.  (Kantor Decl. ¶ 12.)  The Rebuttal Billing Payments were not remitted to the Infinity Lessors and upon information and belief are being held by the Debtor as of the Petition Date.  (*Id.* ¶ 13.)  On July 29, 2025, the Debtor collected additional approximately $1.1 million in payments from Canpotex Leasing, Ltd. a railcar lessee, which was also not remitted to the Infinity Lessors (the "*Additional Rebuttal Billing Payments*").  (*Id.* ¶ 14.)

22.      The funds collected by the Debtor as agent for the Infinity Lessors constitute the property of the Infinity Lessors, and are not property of the Estate.

23.      Additionally, prior to the Petition Date, the Debtor, as agent for the Infinity Lessors, collected Car Hire Fees from certain railroads, which are owed to the Infinity Lessors.  (*Id.* ¶ 15.)

6

Upon information and belief, the Infinity Lessors estimate the amount of Car Hire Fees the Debtor holds for them as of June 30, 2025, is approximately $225,000.00. (*Id.* ¶ 17.) These funds belong to the Infinity Lessors and are not property of the Estate. Upon information and belief, these funds are being held by the Debtor as of the Petition Date. (*Id.* ¶ 18.)

24.     On or about June 26, 2025, the Debtor submitted a series of repair shop billing data to the Infinity Lessors and requested that the Infinity Lessors place more than $5.3 million in custody of the Debtor, which was earmarked for direct transfer by the Debtor to repair vendors who performed work on the Infinity Lessors' railcars (the "*Vendor Repair Advance*"). (*Id.* ¶ 19.)

25.     The table below summarizes the Vendor Repair Advance requested by the Debtor from each Infinity Lessor on or about June 26, 2025:

| Company Data | | Charges & Credits | | | | |
|---|---|---|---|---|---|---|
| Invoice# | Owner | Maintenance | GST | HST | QST | Total |
| 01 | **ARC Rail 2013-1, LLC** | $99,050.63 | $0.00 | $0.00 | $0.00 | **$99,050.63** |
| 02 | **ARC Rail Canada Four ULC (2019-1)** | $1,454,006.45 | $7,602.56 | $0.00 | $0.00 | **$1,461,609.01** |
| 03 | **ARC Rail Canada Sub One ULC (2020-1)** | $33,943.46 | $0.00 | $0.00 | $0.00 | **$33,943.46** |
| 04 | **ARC Rail Canada Three ULC (2022)** | $36,007.89 | $0.00 | $0.00 | $0.00 | **$36,007.89** |
| 05 | **Infinity Transportation 2016-1, LLC** | $938,844.29 | $0.00 | $0.00 | $0.00 | **$938,844.29** |
| 06 | **Infinity Transportation 2018-1, LLC** | $242,927.28 | $24.08 | $0.00 | $0.00 | **$242,951.36** |
| 07 | **Infinity Transportation 2019-1, LLC** | $502,861.38 | $2,079.44 | $3,422.05 | $667.73 | **$509,030.60** |
| 08 | **Infinity Transportation 2020-1, LLC** | $1,087,194.15 | $109.40 | $766.69 | $0.00 | **$1,088,070.24** |
| 09 | **Infinity Transportation 2022, LLC** | $214,923.83 | $0.00 | $0.00 | $0.00 | **$214,923.83** |
| 10 | **Infinity Transportation 2023, LLC** | $317,840.62 | $0.00 | $0.00 | $0.00 | **$317,840.62** |
| 11 | **Infinity Transportation 2024, LLC** | $83,569.92 | $44.22 | $40.07 | $88.21 | **$83,742.42** |
| 12 | **Infinity Transportation III, LLC (GA)** | $312,266.40 | $0.00 | $0.00 | $0.00 | **$312,266.40** |
| 13 | **Infinity Rail Canada Portfolio 6, ULC** | $5,960.68 | $0.00 | $0.00 | $0.00 | **$5,960.68** |

SGR/80714422.2

| Company Data | | Charges & Credits | | | | |
|---|---|---|---|---|---|---|
| Invoice# | Owner | Maintenance | GST | HST | QST | Total |
| 14 | **Infinity Rail Canada Portfolio 7, ULC** | $12,425.76 | $0.00 | $0.00 | $0.00 | **$12,425.76** |
| 15 | **Infinity Transportation 2019-2, LLC** | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| | **Monthly Totals** | **$5,341,822.74** | **$9,859.70** | **$4,228.81** | **$755.94** | **$5,356,667.19** |

(Kantor Decl. ¶ 21.)

26.    Copies of the relevant invoices from RAS for the Vendor Repair Advance are attached hereto as **Exhibit 4**.  (Kantor Decl. ¶ 22.)

27.    On July 11, 2025 and July 16, 2025, the Infinity Lessors transferred to the Debtor via wire transfer a total of $5,390,070.99, consisting of the following:

| | |
|---|---|
| Vendor Repair Advance | $5,356,667.19 |
| Management Fees | $33,403.90 |
| Total | $5,390,071.09 |

(Kantor Decl. ¶ 23.)

28.    The amount of $5,356,667.19 transferred to the Debtor by the Infinity Lessors on July 11, 2025 and July 16, 2025, was earmarked by the Infinity Lessors for the Debtor to pay specific vendors as the Infinity Lessors' agent, and does not constitute property of the Estate.  (*Id.* ¶ 24.)

29.    The Infinity Lessors owed no money to the Debtor other than management fees charged by the Debtor under the Services Agreement.  (*Id.* ¶ 25.)

30.    The funds identified in paragraph 21 (the Rebuttal Billing Payments and the Additional Rebuttal Billing Payments), paragraph 23 (the Car Hire Fees) and paragraph 28 (the Vendor Repair Advance) herein were in possession of the Debtor solely as agent for the Infinity Lessors.  Upon information and belief, these funds are being held by the Debtor as of the Petition Date.

8

31.     Pursuant to the Infinity Lessors' complaint (the "*Complaint*"), filed contemporaneously herewith, the Infinity Lessors seek a declaration that the funds held by the Debtor as their agent are not property of the Estate under section 541(d) of the Bankruptcy Code, and seek to enjoin the Debtor's use of those funds for any other purpose other than for the benefit of the Infinity Lessors.

## REQUESTED RELIEF

32.     By this Motion, the Infinity Lessors seek entry of a TRO and a preliminary injunction by this Court, requiring the Debtor to segregate and maintain the property of the Infinity Lessors.  Entry of a TRO pending a hearing on the Motion will ensure that the funds subject to this Motion are maintained and segregated pending an adjudication on this Motion.  The preliminary injunction, in turn, should clearly provide that the Debtor is not permitted to use, transfer or withdraw any of the property of the Infinity Lessors until a final adjudication of the Infinity Lessors' Complaint.

33.     The Debtor is currently in possession of funds belonging to the Infinity Lessors, consisting of the following:

     a.  A minimum of $2,064,295.00 in Rebuttal Billing Payments collected by the Debtor as agent for the Infinity Lessors as of June 30, 2025; as well as the Additional Rebuttal Billing Payments, which consist of any and all additional payments received from railcar lessees between June 30, 2025 and the Petition Date, which, upon information and belief, total an additional $1.1 million;

     b.  Approximately $225,000.00 in Car Hire Fees collected by the Debtor as agent for the Infinity Lessors as of the Petition Date; and

     c.  A minimum of $5,356,667.19 constituting a Vendor Repair Advance transferred to the Debtor by the Infinity Lessors on July 11, 2025 and July 16, 2025, plus any additional vendor repair advances the Infinity Lessors previously paid to the Debtor which the evidence shows that the Debtor failed to pay to the Infinity Lessor's vendors.

9

34.     Pursuant to Federal Rule 65(b), the Court may issue a TRO if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b).

35.     The Kantor Declaration clearly sets forth the specific facts that demonstrate that the Infinity Lessors will suffer immediate and irreparable injury, loss and damage if the Debtor is able to use, transfer or withdraw any of the funds belonging to the Infinity Lessors.  In addition, the Debtor's counsel will receive notice of the Motion and have a chance to be heard at the emergency hearing on this Motion.

36.     Pursuant to Federal Rule 65(d), the contents of the Court's preliminary injunction order should provide as follows:

a.  State the reasons why it issued: The Debtor is holding property belonging to the Infinity Lessors that the Debtor should be prevented from using, transferring or withdrawing.  The Infinity Lessors will be irreparably harmed in the absence of the preliminary injunction.

b.  State its terms specifically: The Debtor should be ordered to segregate and hold the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance in a separate account.  The injunction should remain in place until final adjudication of the Infinity Lessors' Complaint.

c.  Describe in reasonable detail the acts or acts restrained and required: The Debtor shall place the Rebuttal Billings Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance in a segregated bank account and the Debtor shall be prevented from using, transferring or withdrawing any of such funds until final adjudication of the Infinity Lessors' Complaint.

d.  Persons bound: The preliminary injunction should bind the Debtor, the Debtor's professionals and all other officers, agents, servants, employees and attorneys of the Debtor.

10

## ARGUMENT

37.    Bankruptcy Rule 7065 provides, in relevant part, that "Fed. R. Civ. P. 65 applies in an adversary proceeding."  Fed. R. Bankr. P. 7065; *see also* Fed. R. Bankr. P. 7001(g).

38.    Federal Rule 65(a) permits a Court to issue a preliminary injunction on notice to the adverse party.  Fed. R. Civ. P. 65(a).  Federal Rule 65(b) permits a Court to issue a TRO without notice.  Fed. R. Civ. P. 65(b).

39.    In the Seventh Circuit, a TRO or preliminary injunction can be entered upon a balancing of four factors: "(1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; (3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and (4) whether the granting of a preliminary injunction will disserve the public interest." *Stirneman v. Stirneman (In re Stirneman)*, 421 B.R. 467, 473 (Bankr. N.D. Ill. 2009); *see also Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021) (identifying likelihood of success on the merits and lack of adequate remedy at law and irreparable harm as threshold analysis and balancing harm to defendant and public interest if threshold factors are met); *Duplitronics, Inc. v. Concept Design Elecs. & Mfg. (In re Duplitronics, Inc.)*, 183 B.R. 1010, 1016 (Bankr. N.D. Ill. 1995) (same); *West Bend Mut. Ins. Co. v. Templeton (In re Templeton)*, 150 B.R. 214, 222 (Bankr. N.D. Ill. 1993) (same).

40.    Here, all four factors balance in favor of entering a TRO and preliminary injunction, requiring the Debtor to segregate and hold the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance pending final adjudication of the Infinity Lessors' Complaint.

11

**A. The Infinity Lessors Will Likely Succeed on the Merits.**

41.    The Infinity Lessors' Complaint contains three counts, on all of which the Infinity

Lessors are likely to prevail.  For purposes of this Motion, only Counts I and II are necessary to

discuss.

42.    With respect to Count I (Declaratory Relief finding that the Rebuttal Billing

Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair

Advance are not property of the Debtor's Estate under section 541(d) of the Bankruptcy Code),

the Infinity Lessors will likely succeed on the merits because the Rebuttal Billing Payments, the

Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance are

clearly not property of the Debtor or the Estate under Illinois law governing agency relationships.

43.    Under section 541(d) of the Bankruptcy Code, "[p]roperty in which the debtor holds

. . . only legal title and not an equitable interest . . . becomes property of the estate . . . only to the

extent of the debtor's legal title to such property, but not to the extent of any equitable interest in

such property that the debtor does not hold." 11 U.S.C. § 541(d).

44.    The Supreme Court has held that bankruptcy courts must generally look to state

law to determine property rights in the assets of a bankruptcy estate.  *See Butner v. United States*,

440 U.S. 48, 55 (1979).

45.    In Illinois, "agents generally do not own property transferred into their possession

by or for the benefit of a principal." *Almar Commc'ns, Ltd. v. Telesphere Commc'ns, Inc. (In re

Telesphere Commc'ns, Inc.)*, 167 B.R. 495, 502 (Bankr. N.D. Ill. 1994), *rev'd on other grounds*,

205 B.R. 535 (N.D. Ill.1997); *see also Greenfield Direct Response, Inc. v. Adco List Mgmt. (In re

Greenfield Direct Response, Inc.)*, 171 B.R. 848, 857 (Bankr. N.D. Ill. 1994). An agent who takes

possession of money on behalf of his principal does not become the owner of that money.  *See*

12

*Greenfield*, 171 B.R. at 857; *Telesphere*, 167 B.R. at 502.  Proof of an agency relationship can therefore overcome any presumption of ownership by possession.  *See Telesphere*, 167 B.R. at 502.

46.     In Illinois, parties have an agency relationship "when the principal has the right to control the manner in which the agent performs his work and the agent has the ability to subject the principal to personal liability."  *Santana v. State Bd. of Elections*, 371 Ill. App. 3d 1044, 1054-55 (1st Dist. 2007); *Amigo's Inn, Inc. v. License Appeal Comm'n*, 354 Ill. App. 3d 959, 965 (1st Dist. 2004).  "Where agency authority has been conferred in writing and there is no dispute concerning the parties' relationship, the question becomes one of law."  *Greenfield*, 171 B.R. 855.

47.     Section 3 of the written Services Agreement makes clear the existence of the agency relationship between the Infinity Lessors and the Debtor. In addition, the evidence will show that the parties' conduct and course of performance with each other and with third parties established and reinforced a strict agency relationship.

48.     For instance, Exhibit 2, which is an example of an invoice for Rebuttal Billing issued to one of the railcar lessees by the Debtor, the invoice clearly states that the Rebuttal Billing Payment is to be remitted to the Debtor as "agent for Infinity Transportation." (Kantor Decl. ¶ 10.)

49.     This arrangement is commonplace in the rail industry – indeed, the Debtor has many customers for whom it does the same thing – and the third-party repair vendors and lessees involved understood this agency relationship. (*Id.* ¶ 26.)

50.     The Debtor served only as the agent of the Infinity Lessors with respect to the billing and collection services it performed for the Infinity Lessors. (*Id.* ¶ 27.)

51.     The Debtor is not a repair shop and performed no actual repair services for the Infinity Lessors.  The Debtor merely serves as a data processor, invoice generator, and collection

13

agent for the Rebuttal Billing, collects the funds from the Infinity Lessors and lessees, and then forwards the same to the ultimate recipients. (*Id.* ¶ 6.) The Debtor is not entitled to any portion of the funds collected from the Rebuttal Billing but, instead, is paid a management fee pursuant to the rate schedule set forth in the Services Agreement. (*Id.* ¶ 28.)

52.     Additionally, the Debtor serves as a transfer agent by which payments are made by the Infinity Lessors to vendors who actually perform railcar repair services. (*Id.* ¶ 7.) Those payments are advanced by the Infinity Lessors to the Debtor, as its agent, and earmarked for payment to the specific vendors and are commonly referred to as Vendor Repair Advances. (*Id.*) Each advance by the Infinity Lessors to the Debtor to pay to repair shops is based on reports from the Debtor to the Infinity Lessors identifying specific amounts owed to identified shops. (*Id.* ¶ 8.) Thus, before the Infinity Lessors advance funds to the Debtor, the amounts of those funds are earmarked for particular recipients. The Debtor merely provides an administrative service, as agent, of distributing those funds as middleman according to the predetermined allocations set forth in the supporting data for the invoices issued by the Debtor to the Infinity Lessors.

53.     The Car Hire Fees consist of usage fees that railroads owe to the Infinity Lessors for time and distance that certain of the Infinity Lessors' railcars spend on the railroads' tracks. The Debtor serves as a transfer agent for the collection and remittance of certain Car Hire Fees owed to the Infinity Lessors.  This kind of arrangement is commonplace in the rail industry.  (*Id.* ¶ 16.)

54.     Accordingly, the Infinity Lessors are likely to succeed on Count I of their Complaint insofar as it alleges that the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance are not property of the Debtor or the

SGR/80714422.2

Estate, because the Debtor is holding such funds solely in its capacity as agent for the Infinity
Lessors under the Services Agreement.

55.     With respect to Count II (Imposition of a Constructive Trust over the Rebuttal
Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor
Repair Advance), the Infinity Lessors will also likely succeed on the merits.

56.     "In Illinois, as in most states, the remedy [of constructive trust] is appropriate
[w]hen a person has obtained money to which he is not entitled, under such circumstances that in
equity and good conscience he ought not to retain it . . . to avoid unjust enrichment." *In re
Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 304 (7th Cir. 2014) (internal citations and
quotations omitted).

57.     In addition, "[a] constructive trust will be used to compel a party who unfairly holds
a property interest or money to convey that property to the one to whom it justly belongs." *A.T.
Kearney, Inc. v. INCA Intern., Inc.*, 132 Ill. App. 3d 655, 660 (1985). A party "unfairly hold[s]
property" when they would be "unjustly enriched if [they] were permitted to retain such property."
*Id.* (*citing Zack Co. v. Sims*, 108 Ill. App. 3d 16 (1982)).

58.     A confidential or fiduciary relationship as the basis for a constructive trust exists as
a matter of law between a principal and his or her agent. *See Ray v. Winter*, 67 Ill. 2d 296 (1977);
*Carroll v. Caldwell*, 12 Ill. 2d 487 (1957); *Bremer v. Bremer*, 411 Ill. 454 (1952).

59.     When an agent acts on behalf of another and thereby gains something for him or
herself that in equity and good conscience the agent should not be permitted to keep, a court will
impose a constructive trust and compel the agent to turn the property over to the person equitably
entitled to it, or otherwise to execute the trust, as the court may direct. *See Black v. Gray*, 411 Ill.
503 (1952). An agent undertaking any business or the performance of any service for another is

15

not allowed, under equitable principles, to deal with the subject matter of the agency on his or her own account or for his or her own benefit, and if the agent does attempt so to deal, he or she will be deemed a constructive trustee for the principal. *Kuzlik v. Kwasny*, 383 Ill. 354, 361 (1943).

60.    As the Infinity Lessors' agent, the Debtor owes a fiduciary duty to the Infinity Lessors to direct the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance in the manner governed by the Services Agreement and the parties' course of dealing and course of performance. Despite the Debtor's fiduciary duties to the Infinity Lessors, the Debtor has not transferred the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees or the Vendor Repair Advance to the Infinity Lessors or to the vendors for which such funds were expressly earmarked.

61.    If the Debtor is permitted to retain the Infinity Lessors' property and spend it as it wishes, the Debtor will be unjustly enriched as such funds are the property of the Infinity Lessors and are held solely for the benefit of the Infinity Lessors and the repair vendors who are owed millions of dollars.

62.    Accordingly, as explained above, the elements of constructive trust are satisfied here. The Infinity Lessors are also likely to succeed on the merits with respect to their request for a constructive trust over the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance and this factor weighs in favor of entering the TRO and preliminary injunction.

**B.  The Infinity Lessors Have No Adequate Remedy at Law and Will Be Irreparably Harmed in the Absence of a TRO and Preliminary Injunction.**

63.    If the Debtor is allowed to spend or otherwise distribute the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees or the Vendor Repair Advance, the Infinity Lessors will have no adequate remedy at law.  A money judgment against a

16

bankrupt debtor will do the Infinity Lessors no good if the Debtor has spent the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees or the Vendor Repair Advance prior to adjudication of the Complaint.

64.     Once the Debtor spends or otherwise distributes the Infinity Lessors' monies to the Debtor's other creditors or their vendors, the Infinity Lessors will be left with only an unsecured claim against an insolvent bankruptcy estate and the Infinity Lessors will have to pay *another* $5.3 million or more to its vendors, which funds will have been misappropriated to unjustly enrich the Debtor and the Debtor's other creditors.

65.     Furthermore, the Debtor's failure to pay the Infinity Lessor's repair vendors will irreparably damage the Infinity Lessors' reputation – making the Infinity Lessors appear not to be paying their repair bills. (Kantor Decl. ¶ 30.).  *See, e.g.*, *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) (including as evidence of irreparable harm "the risk [to the plaintiff] of the loss of valuable goodwill").

66.     Denying the requested relief also could cause chaos for the Infinity Lessors' business by resulting in repair vendors possibly refusing to do further work for the Infinity Lessors, asserting liens on and/or holding hostage any of the Infinity Lessors' railcars currently in the vendors' possession, or even conceivably going into insolvency themselves – putting the Infinity Lessors' railcars at risk. Additionally, such actions could expose the Infinity Lessors to potential claims by the railcar lessees for breaching the terms of their railcar leases.  (Kantor Decl. ¶ 31.)

67.     These facts are similar to those in PACA cases in which money is held in trust.  *See, e.g.*, *Horizon Mktg. v. Kingdom Int'l, Ltd.*, 244 F. Supp. 2d 131, 140 (E.D.N.Y. 2003) (court found that the movant seeking a preliminary injunction would be irreparably harmed in the absence of an injunction due to "the risk that a produce buyer will have dissipated the PACA trust without

17

paying the produce seller, thus leaving the produce seller out of luck and out of money"). *See also Despins v. Taurus Fund LLC (In re Ho Wan Kwok)*, 2023 Bankr. LEXIS 3128, at *14-*15 (Bankr. D. Conn. Aug. 24, 2023) ("In the context of bankruptcy, particularly where relief is sought in equity – here, through assertions of *alter ego* and beneficial ownership – the dissipation or damage to assets of [the defendant] pending a determination on the merits is irreparable harm.").

68.     Because the Infinity Lessors will be irreparably harmed if the Debtor is able to use the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance, this factor weighs in favor of entering the TRO and preliminary injunction.

## C. <u>The Balance of Harms Weighs in Favor of Entering the TRO and Preliminary Injunction</u>.

69.     The Infinity Lessors have demonstrated that they will suffer irreparable harm if the TRO and preliminary injunction are not entered and the Debtor is permitted to spend or otherwise dispose of the Infinity Lessors' money.  On the other hand, the Debtor will not suffer any harm if the TRO and preliminary injunctions are imposed and the status quo is maintained.

70.     First, none of the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance are property of the estate and should not be used by the Debtor to fund its bankruptcy case.  This is property that should have been returned to the Infinity Lessors prior to the Petition Date and does not belong to the Debtor.  Based on the Debtor's fundamental business model, the Debtor cannot claim that it reasonably expected to rely on the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees or the Vendor Repair Advance to meet any of the Debtor's own obligations or the obligations of the Debtor's other railcar owner-principals.  Thus, segregating those funds and preventing the

18

Debtor from using them – at least until the Court definitively decides the underlying estate property issue – does not harm the Debtor.

71.     To the contrary, imposing the constructive trust will help the Debtor rather than harming it because it will avoid any potential argument that the Debtor has breached a fiduciary duty by misusing its principals' funds for an unauthorized purpose. Moreover, should the Debtor seek to sell its business as a going concern and assume and assign the Services Agreement, it will preserve those funds which would be required to be paid to the Infinity Lessors anyway to cure any breaches. *See* 11 U.S.C. § 365(b)(1).

72.     Therefore, the Debtor will have to return the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance to the Infinity Lessors in any case at the appropriate time during this case.  Entry of a TRO and preliminary injunction will only ensure that the funds necessary to maintain the status quo as to the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance are kept segregated from the Debtor's Estate until that can occur.

73.     Accordingly, this factor weighs in favor of entering the TRO and preliminary injunction.

    **D.  <u>Public Policy Will Be Served by Entering the TRO and Preliminary Injunction</u>**.

74.     Public policy will be served by entering the TRO and preliminary injunction and requiring the Debtor to segregate and hold the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance pending a final adjudication of the Infinity Lessors' Complaint.  Pursuant to the Services Agreement and the business relationship between the parties, the Debtor acted as the Infinity Lessors' agent and, as such, was not permitted to use the funds in any way other than directed by the Infinity Lessors.

SGR/80714422.2

75.     Indeed, the Infinity Lessors do not have a simple claim against the Debtor for amounts owed.  The funds in the possession of the Debtor are not the Debtor's property and not property of the Estate.  No bankruptcy policies would be served by permitting the Debtor to use property of another to fund its bankruptcy case over the objection of the Infinity Lessors.

76.     Further, as noted above, ensuring the proper, originally intended application of the Infinity Lessors' money has far-reaching implications beyond the Debtor and the Infinity Lessors. It directly impacts a large number of repair shops and railcar lessees throughout North America. Thus, the requested relief will have industry-wide benefits.

77.     Accordingly, this factor weighs in favor of entering the TRO and preliminary injunction as well.  Because all the factors weigh in favor of entering the preliminary injunction, the Court should grant this Motion and enter a preliminary injunction requiring the Debtor to segregate and maintain the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance in a separate account until final adjudication of the Infinity Lessors' Complaint.

**E.  The Infinity Lessors' Funds Will Act as the Bond**.

78.     Federal Rule 65(c) provides, in part, that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained."  Fed. R. Civ. P. 65(c)

79.     Here, because the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance will be held by the Debtor and segregated, it will act as the Infinity Lessors' bond with respect to requirement of Federal Rule 65(c).  No further security is necessary.

20

WHEREFORE, the Infinity Lessors respectfully entry of a TRO and a preliminary injunction against the Debtor as follows:

    a.  Immediately requiring the Debtor to segregate and maintain in a separate account the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance, and all other Infinity Lessor property in the Debtor's possession, whether received pre-petition or post-petition;

    b.  Entering an immediate TRO and, after the hearing on the Motion, preliminarily enjoining the Debtor and its professionals and all other officers, agents, servants, employees and attorneys from using, transferring or withdrawing any cash from the segregated account containing the Rebuttal Billing Payments, the Additional Rebuttal Billing Payments, the Car Hire Fees and the Vendor Repair Advance, and all other Infinity Lessor property in the Debtor's possession, whether received pre-petition or post-petition, until further order of the Court; and

    c.  Granting such other relief as the Court deems necessary and appropriate.

Dated:  August 4, 2025

Respectfully submitted,

**INFINITY TRANSPORTATION 2024, LLC**,
*et al.*,

By: */s/ Michael K. Desmond*

Shelly A. DeRousse (Atty. No. 6274798)
Michael K. Desmond (Atty. No. 6208809)
Elizabeth L. Janczak (Atty. No. 6302864)
Shira R. Isenberg (Atty. No. 6279718)
SMITH, GAMBRELL & RUSSELL, LLP
311 South Wacker Dr., Suite 3000
Chicago, Illinois 60606
Telephone: (312) 360-6000
Facsimile: (312) 360-6520
sderousse@sgrlaw.com
mdesmond@sgrlaw.com
ejanczak@sgrlaw.com
sisenberg@sgrlaw.com

SGR/80714422.2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No.: 25-11837 |
| RAS DATA SERVICES, INC., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Hon. Judge Michael B. Slade |
| _____ | ) | |
| | ) | |
| INFINITY TRANSPORTATION 2024, LLC; | ) | |
| INFINITY TRANSPORTATION 2023, LLC | ) | |
| INFINITY TRANSPORTATION 2022, LLC; | ) | |
| INFINITY TRANSPORTATION 2020-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2020-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2019-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2019-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2018-1, LLC; | ) | |
| INFINITY TRANSPORTATION 2018-2, LLC; | ) | |
| INFINITY TRANSPORTATION 2016-1, LLC; | ) | |
| INFINITY TRANSPORTATION III LLC; | ) | |
| INFINITY RAIL CANADA PORTFOLIO 6 ULC; | ) | |
| INFINITY RAIL CANADA PORTFOLIO 7 ULC; | ) | |
| ARC RAIL 2013-1, LLC; | ) | |
| ARC RAIL CANADA FOUR, ULC; | ) | |
| ARC RAIL CANADA SUB ONE, ULC; | ) | |
| ARC RAIL CANADA TWO, ULC; | ) | |
| ARC RAIL CANADA FIVE, ULC; | ) | |
| ARC RAIL CANADA THREE, ULC; and | ) | |
| INFINITY TRANSPORTATION | ) | |
| EQUIPMENT LEASING, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 25-00244 |
| v. | ) | |
| | ) | |
| RAS DATA SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DECLARATION OF JONATHAN KANTOR</u>**

SGR/80766231.1

JONATHAN KANTOR, Chief Financial Officer of Infinity Transportation Equipment Leasing, LLC, hereby submits this declaration under oath and penalty of perjury, in support of the emergency motion of Infinity Transportation 2024, LLC, Infinity Transportation 2023, LLC, Infinity Transportation 2022, LLC, Infinity Transportation 2020-1, LLC, Infinity Transportation 2020-2, LLC, Infinity Transportation 2019-1, LLC, Infinity Transportation 2019-2, LLC, Infinity Transportation 2018-1, LLC, Infinity Transportation 2018-2, LLC,  Infinity Transportation 2016-1, LLC, Infinity Transportation III, LLC, ARC Rail 2013-1, LLC (the foregoing entities collectively, the "*Infinity Owners*"), Infinity Rail Canada Portfolio 6 ULC, Infinity Rail Canada Portfolio 7 ULC, ARC Rail Canada Four, ULC, ARC Rail Canada Sub One, ULC, ARC Rail Canada Two, ULC, ARC Rail Canada Five, ULC, ARC Rail Canada Three, ULC (the foregoing entities collectively, the "*Infinity Canada Owners*") and Infinity Transportation Equipment Leasing, LLC, ("*ITEL*" and together with the Infinity Owners and the Infinity Canada Owners, the "*Plaintiffs*" or "*Infinity Lessors*") (the "*Motion*"), and states as follows:

1.      I am the Chief Financial Officer of Infinity Transportation Equipment Leasing, LLC, one of the Plaintiffs in this adversary proceeding.  I have personal knowledge of all facts set forth in this Declaration, all of which are true and correct.

2.      The Infinity Owners and Infinity Canada Owners (together, the "*Infinity Lessors*") collectively own for purposes of leasing approximately 47,000 railcars throughout North America.

3.      On or about December 30, 2021, certain of the Infinity Lessors entered into a Management Services Agreement with RAS Data Services, Inc. (the "*Debtor*") to provide the services described therein as summarized in the Complaint ("*Services Agreement*").  The Services Agreement has a four-year term, which will expire on December 31, 2025.  A true and correct copy of the Services Agreement is attached to the Motion as Exhibit 1.

2

4.      Paragraph 3 of the Services Agreement provides as follows:

**(3) AGENT FOR RECEIPT OF RAILROAD BILLING**

RAS and each Railcar Owner (solely for itself and its railcars) will be jointly responsible for updating industry publications such that RAS will receive all maintenance billing directly from repairing railroads. Subsequent to pre-payment audit and approval based on Association of American Railroads rules and Generally Accepted Accounting Principles, RAS will render payment to railroads on behalf of each Railcar Owner. RAS will generate and distribute all necessary billing disputes to appropriate vendors on behalf of each Railcar Owner. At the close of each accounting period, RAS will submit an invoice to each applicable Railcar Owner with sufficient documentation so that the Railcar Owner will reimburse RAS in full for maintenance, management, and related charges on a maximum net fourteen (14) day payment schedule.

5.      As acknowledged by the Debtor's Chief Restructuring Officer, the Debtor renders no payment to railroads and repair vendors on behalf of the Infinity Lessors unless and until the Infinity Lessors transfer sufficient funds to the Debtor in advance – referred to as vendor repair advances – which are specifically earmarked for payment to such vendors for specific repair services.

6.      The Debtor is not a repair shop and performs no actual repair services for the Infinity Lessors, however the Debtor performs other important services for the Infinity Lessors. First, the Debtor serves as a collection agent for repair billings commonly referred to as "Rebuttal Billing," which is billing to certain railcar lessees seeking reimbursement for repair and maintenance costs that the Infinity Lessors advanced money to pay but which are allocated to the lessees under their leases with the Infinity Lessors.

7.      Second, the Debtor serves as a transfer agent by which payments are made by the Infinity Lessors to vendors who actually perform railcar repair services.  Those payments are advanced by the Infinity Lessors to the Debtor, as its agent, and earmarked for payment to the specific vendors.

SGR/80766231.1

8.      Specifically, the Debtor receives repair data from repair vendors, processes that data to generate invoices to the Infinity Lessors and to the lessees, as agent for the Infinity Lessors, for the items for which each bear responsibility.

9.      The Debtor then collects the money from the Infinity Lessors to pay to the repair vendors, and the Debtor collects money from the lessees through Rebuttal Billing to reimburse the Infinity Lessors.

10.      An example of Rebuttal Billing issued by the Debtor on behalf of the Infinity Lessors is attached to the Motion as Exhibit 2.  The invoice clearly reflects that any payment is to be remitted to the Debtor "as agent for Infinity Transportation."

11.      Funds collected by the Debtor on behalf of the Infinity Lessors are supposed to be remitted by RAS to the Infinity Lessors on a monthly basis.

12.      Attached to the Motion as Exhibit 3 is a report of Rebuttal Billing Payments for the month ended June 30, 2025, reflecting that the Debtor collected approximately $2,064,295.00 in payments from railcar lessees as agent for the Infinity Lessors.

13.      The June 2025 Rebuttal Billing Payments received by the Debtor were not remitted to the Infinity Lessors  and are being held by the Debtor as of the Petition Date.

14.      On July 29, 2025, the Debtor collected Additional Rebuttal Billing Payments totaling approximately $1.1 million in payments from Canpotex Leasing, Ltd., a railcar lessee, which was also not remitted to the Infinity Lessors.

15.      Additionally, prior to the Petition Date, the Debtor, as agent for the Infinity Lessors, collected Car Hire Fees from certain railroads, which are owed to the Infinity Lessors.

16.      The Car Hire Fees consist of usage fees that railroads owe to the Infinity Lessors for time and distance that certain of the Infinity Lessors' railcars spend on the railroads' tracks.

4

The Debtor serves as a transfer agent for the collection and remittance of certain Car Hire Fees owed to the Infinity Lessors. This kind of arrangement is commonplace in the rail industry.

17.    The Infinity Lessors estimate the amount of Car Hire Fees the Debtor holds for them as of June 30, 2025, is approximately $225,000.00.

18.    The Infinity Lessors believe these funds as well as additional funds collected during the month of July 2025 are being held by the Debtor as of the Petition Date.

19.    On or about June 26, 2025, the Debtor submitted a series of repair shop billing data to the Infinity Lessors and requested that the Infinity Lessors place more than $5.3 million in custody of the Debtor, which was earmarked for direct transfer by the Debtor to repair vendors who performed work on the Infinity Lessors' railcars (the "*Vendor Repair Advance*").

20.    Each Vendor Repair Advance made by the Infinity Lessors to the Debtor to pay to repair shops is based on reports from the Debtor to the Infinity Lessors identifying specific amounts owed to identified shops.

21.    The table below summarizes the Vendor Repair Advance requested by the Debtor from each Infinity Lessor on or about June 26, 2025:

| Company Data | | Charges & Credits | | | | |
|---|---|---|---|---|---|---|
| Invoice# | Owner | Maintenance | GST | HST | QST | Total |
| 01 | ARC Rail 2013-1, LLC | $99,050.63 | $0.00 | $0.00 | $0.00 | $99,050.63 |
| 02 | ARC Rail Canada Four ULC (2019-1) | $1,454,006.45 | $7,602.56 | $0.00 | $0.00 | $1,461,609.01 |
| 03 | ARC Rail Canada Sub One ULC (2020-1) | $33,943.46 | $0.00 | $0.00 | $0.00 | $33,943.46 |
| 04 | ARC Rail Canada Three ULC (2022) | $36,007.89 | $0.00 | $0.00 | $0.00 | $36,007.89 |
| 05 | Infinity Transportation 2016-1, LLC | $938,844.29 | $0.00 | $0.00 | $0.00 | $938,844.29 |
| 06 | Infinity Transportation 2018-1, LLC | $242,927.28 | $24.08 | $0.00 | $0.00 | $242,951.36 |
| 07 | Infinity Transportation 2019-1, LLC | $502,861.38 | $2,079.44 | $3,422.05 | $667.73 | $509,030.60 |

SGR/80766231.1

| Company Data | | Charges & Credits | | | | |
|---|---|---|---|---|---|---|
| Invoice# | Owner | Maintenance | GST | HST | QST | Total |
| 08 | **Infinity Transportation 2020-1, LLC** | $1,087,194.15 | $109.40 | $766.69 | $0.00 | **$1,088,070.24** |
| 09 | **Infinity Transportation 2022, LLC** | $214,923.83 | $0.00 | $0.00 | $0.00 | **$214,923.83** |
| 10 | **Infinity Transportation 2023, LLC** | $317,840.62 | $0.00 | $0.00 | $0.00 | **$317,840.62** |
| 11 | **Infinity Transportation 2024, LLC** | $83,569.92 | $44.22 | $40.07 | $88.21 | **$83,742.42** |
| 12 | **Infinity Transportation III, LLC (GA)** | $312,266.40 | $0.00 | $0.00 | $0.00 | **$312,266.40** |
| 13 | **Infinity Rail Canada Portfolio 6, ULC** | $5,960.68 | $0.00 | $0.00 | $0.00 | **$5,960.68** |
| 14 | **Infinity Rail Canada Portfolio 7, ULC** | $12,425.76 | $0.00 | $0.00 | $0.00 | **$12,425.76** |
| 15 | **Infinity Transportation 2019-2, LLC** | $0.00 | $0.00 | $0.00 | $0.00 | **$0.00** |
| | **Monthly Totals** | **$5,341,822.74** | **$9,859.70** | **$4,228.81** | **$755.94** | **$5,356,667.19** |

22.     Attached to the Motion as <u>Exhibit 4</u> are copies of the relevant invoices from RAS for the Vendor Repair Advance.

23.     On July 11, 2025 and July 16, 2025, the Infinity Lessors transferred to the Debtor via wire transfer a total of $5,390,070.99, consisting of the following:

> Vendor Repair Advance        $5,356,667.19
> Management Fees               $33,403.90
> Total                         $5,390,071.09

24.     The amount of $5,356,667.19 transferred to the Debtor by the Infinity Lessors on July 11, 2025 and July 16, 2025, was earmarked by the Infinity Lessors for the Debtor to pay specific vendors as the Infinity Lessors' agent.

25.     The Infinity Lessors owed no money to the Debtor for its own benefit other than management fees charged by the Debtor under the Services Agreement.

26.     The arrangement between the Infinity Lessors and the Debtor is commonplace in the rail industry – indeed, the Plaintiffs' understanding is that the Debtor has many customers for whom it performs the same services.

6

27.     The Debtor served only as the agent of the Infinity Lessors with respect to the billing and collection services it performed for the Infinity Lessors.

28.     The Debtor is not entitled to any portion of the funds collected from the Rebuttal Billing but, instead, is paid a management fee pursuant to the rate schedule set forth in the Services Agreement.

29.     Thus, before the Infinity Lessors advance funds to the Debtor, the amounts of those funds are earmarked for particular recipients. The Debtor merely provides an administrative service, as agent, of distributing those funds as middleman according to the predetermined allocations set forth in the supporting data for the invoices issued by the Debtor to the Infinity Lessors.

30.     The Debtor's failure to pay the Infinity Lessor's repair vendors will irreparably damage the Infinity Lessors' reputation – making the Infinity Lessors appear not to be paying their repair bills.

31.     If the Debtor is permitted to use, transfer or withdraw the funds it is holding that belong to the Infinity Lessors, it also could cause chaos for the Infinity Lessors' business by resulting in repair vendors possibly refusing to do further work for the Infinity Lessors, asserting liens on and/or holding hostage any of the Infinity Lessors' railcars currently in the vendors' possession, or even conceivably going into insolvency themselves – putting the Infinity Lessors' railcars at risk. Additionally, such actions may expose the Infinity Lessors to potential claims by the railcar lessees for breaching the terms of their railcar leases.

7

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 4, 2025

By: _____

Jonathan Kantor

SGR/80766231.1

# EXHIBIT 1

# MANAGEMENT SERVICES AGREEMENT

Among each of
**Infinity Transportation 2022, LLC**
**Infinity Transportation 2020-1, LLC**
**Infinity Transportation 2019-1, LLC**
**Infinity Transportation 2019-2, LLC**
**Infinity Transportation 2018-1, LLC**
**Infinity Transportation 2018-2, LLC**
**Infinity Transportation 2016-1, LLC**
**Infinity Transportation III LLC**
**ARC Rail 2013-1, LLC**

each, individually in its own capacity, and not joint and severally, hereafter referred to as a "Railcar Owner", including any Railcar Owner who later joins by entering into the form of Joinder attached hereto as Annex 1,

**Care of Infinity Transportation Equipment Leasing, LLC, as Servicer,**
**1355 Peachtree Street NE**
**Suite 750, South Tower**
**Atlanta, GA 30309**

and

**RAS Data Services, Inc.**
**1510 Plainfield Road**
**Suite 3**
**Darien, Illinois  60561**

hereafter referred to as "RAS"

## (1)   TERM AND SCOPE

This Management Services Agreement ("**Agreement**") will commence on January 1, 2022 (the "Effective Date") and shall continue for a period of four (4) years ("**Term**") or until otherwise validly terminated as provided below in this Section, or under Section 9 below.  Accounting periods are monthly in frequency and are closed one month subsequent to the calendar month.  RAS shall provide to each Railcar Owner certain mechanical, regulatory, accounting and consulting services as more fully defined below ("**the "Services"**"), for railcars owned by

1

DocuSign Envelope ID: DCE3BA8C-2385-46C8-AA3F-6CBC48597794

each Railcar Owner ("**Infinity Railcar Fleet**").  This Agreement supersedes any and all executed Agreements for similar services currently in place between any of the Railcar Owners and RAS. Without limiting the preceding sentence, as of the Effective Date, the Agreement in force between RAS and VTG Rail, Inc., dated August 1, 2019, which was assigned to Railcar Owner Infinity Transportation 2020-1, LLC, by VTG Rail, Inc., is hereby terminated.   The Term of this Agreement shall be deemed to have extended for successive one (1) year periods unless either RAS or any Railcar Owner (solely for itself and its railcars) provides written notice to the other not less than thirty (30) days prior to the expiration of the then current term, notifying of its intention to either terminate or to renegotiate the key terms and conditions.

## (2)    ADDITIONAL CONTRACTORS

RAS may, at its discretion, enlist additional software, support, and/or service contractors to fulfill the obligations of the Agreement.  RAS assumes all liabilities for cost, performance/nonperformance, and support of services provided by such contractors, which in all respects will be subject to all terms hereof to which RAS is subject, excepting Indurante & Associates, Inc., who will not be subject to the **SaaS Terms Addendum** and the **CyberSecurity Addendum** attached hereto and incorporated herein by reference.  Each Railcar Owner will not by association with RAS be considered a licensee or remarketer of such services and/or systems, responsible to pay their fee, cost and expenses or liable in any way for their performance.

## (3)    AGENT FOR RECEIPT OF RAILROAD BILLING

RAS and each Railcar Owner (solely for itself and its railcars) will be jointly responsible for updating industry publications such that RAS will receive all maintenance billing directly from repairing railroads. Subsequent to pre-payment audit and approval based on Association of American Railroads rules and Generally Accepted Accounting Principles, RAS will render payment to railroads on behalf of each Railcar Owner.  RAS will generate and distribute all necessary billing disputes to appropriate vendors on behalf of each Railcar Owner.  At the close of each accounting period, RAS will submit an invoice to each applicable Railcar Owner with sufficient documentation so that the Railcar Owner will reimburse RAS in full for maintenance, management, and related charges on a maximum net fourteen (14) day payment schedule.

## (4)    SCOPE OF SERVICES

RAS will perform and/or provide the following Services based on applicable AAR Rules, Railroad Industry Standard Practices, and Generally Accepted Accounting Principles:

❑  Mileage Collection and Accounting
❑  Receipt and Reconciliation of Repair Data
❑  Car Repair Billing Processing and Auditing
❑  Post Payment Audit and Processing of Exceptions
❑  Lease Information Management and Rebilling
❑  Management of Bad Order and Railroad Damaged Equipment
❑  Umler Management

DocuSign Envelope ID: DCE3BA8C-3385-46C8-AA3E-6CBC48597794

□   Ad Valorem Tax Filing
□   Management Reporting
□   Technical Support

## (5)   *FLEET REPAIR DATABASE AND MANAGEMENT REPORTING*

RAS will maintain a database containing repairs performed by railroads, private shops, and on-site contactors, and mileage records for the Railcar Owners' collective railcar fleet. This will be the source of periodic management reports which will be based on the Railcar Owners' specifications, and will include, among other things:

□   Mileage Allocation by Railroad and State
□   Mileage History by Car

RAS also will provide ad hoc reports at no charge, provided the nature of a Railcar Owner's requests do not exceed RAS's reasonable current capabilities, and that volume of such requests does not significantly or unreasonably increase RAS' costs.

## (6)   *SYSTEMS AND TECHNOLGY*

The systems identified in Exhibit A of this Agreement (**"the Systems"**) will be made available by RAS to the Railcar Owners so that they and their designated representatives may access the Systems from time to time.  RAS will be subject to the **SaaS Terms Addendum** attached hereto and incorporated herein by reference.

## (7)   *DATA SECURITY*

RAS will maintain a prudent data security strategy at all times while this Agreement is in effect. RAS will be subject to the **CyberSecurity Addendum** attached hereto and incorporated herein by reference.  Any additional data security measures reasonably requested by any Railcar Owner shall be implemented promptly upon notice to do so, provided that such measures are within RAS' reasonable capabilities and do not materially increase RAS' cost.

## (8)   *CHARGES AND FEES*

The Railcar Owners will remit to RAS under terms of a net fourteen (14) day payment after receipt of invoice, management fees for each processed account month based on the following schedule:

| | | |
|---|---|---|
| First 10,000 Cars | $▮▮▮▮ | Flat Rate Per Month |
| Next 2,000 Cars | ▮▮▮▮ | Per Car Per Month |
| Next 2,000 Cars | $▮▮▮ | Per Car Per Month |
| Next 2,000 Cars | $▮▮▮ | Per Car Per Month |
| Next 2,000 Cars | ▮▮▮ | Per Car Per Month |
| Next 2,000 Cars | $▮▮▮ | Per Car Per Month |
| Next 2,000 Cars | $▮▮ | Per Car Per Month |

3

DocuSign Envelope ID: DCE3BA0C-3385-46C8-AA3F-6CBC48597784

| | | |
|---|---|---|
| Next 2,000 Cars | ███ | Per Car Per Month |
| Next 2,000 Cars | ███ | Per Car Per Month |
| Next 2,000 Cars | ███ | Per Car Per Month |
| Next 2,000 Cars | ███ | Per Car Per Month |
| Next 2,000 Cars | ███ | Per Car Per Month |

Should the size of the Railcar Owners' collective fleet increase or decrease to an amount outside the limits of the above rate chart during the term of the Agreement, an adjusted rate mutually acceptable to all parties will be determined. For purposes of determining the fee tier above for each account month while this Agreement is in effect, the Railcar Owners' fleet size will be aggregated to include the railcars of all Railcar Owners who are parties to this Agreement, and each Railcar Owner will be invoiced separately at the resulting Per Car Per Month rate multiplied by that Railcar Owner's number of railcars.

Each Railcar Owner (solely for itself and its railcars) will be responsible for payment of all fees including, but not limited to, charges for (a) railroad and contract repair shop repairs b) Ad Valorem tax assessments; (c) transportation, switching, and demurrage); (d) Railinc and InteRRIS data; (e) other AAR registrations and fees; and (f) fees related to the development and maintenance of government-mandated compliance plans.

Field services outside the scope of this Management Services Agreement, such as inspections of leased railcars for acceptance or return, may be performed depending on availability of RAS personnel. The cost for such services will be $85.00 per man hour portal to portal, plus actual, reasonable expenses. No such charges shall be accrued without advance written scope of work, written estimate of charges, and written consent of RAS and the applicable Railcar Owner(s).

Charges for miscellaneous consulting work pre-approved by a Railcar Owner and outside the scope of this Management Services Agreement will be billed at a rate of $100.00 per hour for Information Technology personnel and $75.00 per hour for Client Services personnel. No such charges shall be accrued without advance written scope of work, written estimate of charges, and written consent of of RAS and the applicable Railcar Owner(s).

## *(9)   TERMINATION*

Should a party (the "Defaulting Party") (i) default in the timely payment of any sum due with respect to the Services, or (ii) (A) fail to perform (including, without limitation, to timely perform) any of its obligations with respect to the Services hereunder, including, without limitation, (B) failing to perform (including, without limitation, to timely perform) to the reasonable satisfaction of the other party after reasonable notice and opportunity to cure (provided, however, that foregoing does not limit, impair, or waive any terms of the CyberSecurity Addendum and the SaaS Terms Addendum that provide more specific standards and remedies), or (iii) apply for or consent to the appointment of any liquidator, receiver, trustee, administrator or similar official for itself or all or substantially all of its assets; or (iv) institute any bankruptcy, insolvency, arrangement, readjustment, compromise or rescheduling of debt, dissolution, liquidation, winding up or similar executory or judicial proceeding relating

DocuSign Envelope ID: DCE3BA0C-3385-46C8-AA3F-6CBC48597694

to it under any jurisdiction (any of the foregoing (i)-(iv), an "Event of Default") (and, for an Event of Default other than under the foregoing (ii)(B), such Event of Default is not cured by the Defaulting Party within thirty (30) days of receipt of an Event of Default notice sent by the non Defaulting Party), any non Defaulting Party may terminate this Agreement without any further notice. Upon termination, the defaulting Railcar Owner(s), if any, shall remain obligated to pay all actual charges hereunder accrued prior to and on the date of termination, and RAS shall remain obligated to perform the Services up and until the date of termination.  Upon termination, RAS shall (a) progress all outstanding claims for counter billing to their logical conclusion at no additional charge to the applicable Railcar Owner(s), (b) pay and/or remit, applicable, any amounts RAS owes to each applicable Railcar Owner, and (c) provide to the applicable Railcar Owner(s) in a 500-byte file and any other user-friendly form requested by the Railcar Owners, at no additional charge, all historical data for the Term of this Agreement, up through the date of termination, that is in RAS' possession, and retain a copy of said data for 180 days post-termination as a backup for use in honoring any requests the Railcar Owner or its servicer makes for additional downloads.

## (10)   FORCE MAJEURE

Except as provided in the the CyberSecurity Addendum and the SaaS Terms Addendum, neither RAS nor any Railcar Owner will be liable or considered in default of the Agreement for delay or failure to perform its obligations under the Agreement, should said delay or failure be fewer than 30 continuous days or fewer than 40 intermittent days within a 60-day period and be caused, directly or indirectly, by conditions outside the reasonable control of RAS or the Railcar Owner; provided, however, that such party uses its commercially reasonable best efforts to, and diligently works to, cure such non-performance in the shortest reasonable time period. These conditions include, but are not limited to, floods, fires, earthquakes, damaging weather, labor disruptions, breakage of equipment, civil disorders, acts of God, declarations of war, or other actions of government.

The party asserting force majeure shall, in each instance, give the other party prompt written notice after knowledge thereof.  Such notice shall include a brief description of the events or circumstances of force majeure, an estimate of the anticipated duration and the proposed actions it is taking to cure the non-performance under the Agreement.  Within a reasonable time after knowledge of the cessation of any such continuing events or circumstances constituting force majeure, the party that asserted the same shall give the other party written notice of the date of such cessation.

## (11)   CONFIDENTIAL DISCLOSURE

As used herein, "**Confidential Information**" shall mean any and all technical or business information furnished, in whatever form or medium, or information of a confidential nature disclosed by one party (the "**Discloser**") to the other (the "**Recipient**") including, but not limited to, all information related to each Railcar Owner's, and the Railcar Owners' collective,

DocuSign Envelope ID: DCF3BA9C-3385-46C8-AA3F-6CBC48597794

railcar fleet and individual railcars and leases, and each party's business; strategies; customers; financial and cost data; any and all information in any way related to any Railcar Owner or its business activities that RAS shall collect, receive or otherwise possess in connection with, or as a result of, performing the Services or any of its other obligations under this Agreement; and personnel information. Confidential Information shall include information disclosed verbally, as well as information visually observed in performance of the Agreement.

Confidential Information shall not include information: (a) which was in Recipient's possession before its receipt from Discloser; (b) which at the time of its disclosure to Recipient is, or thereafter becomes through no fault of Recipient's, available to the public; or (c) which has been rightfully furnished to Recipient by a third party unaffiliated to the Discloser and without restriction on disclosure or use.

Recipient agrees to hold Confidential Information in confidence and shall use same solely for performance hereunder unless otherwise authorized in writing by Discloser. Recipient agrees neither to copy nor to disclose Confidential Information to anyone, except to Recipient's related entities and their officers, employees, accountants, and attorneys, but in each such instance only if disclosure is necessary for the performance of the Recipient's obligations hereunder. Recipient shall notify each such person to whom information is disclosed of the obligations set forth herein, and Recipient shall be liable for any violation of these obligations by said persons to whom information is disclosed.

Confidential Information shall remain the property of Discloser. Upon Discloser's request, Recipient will return to Discloser all Confidential Information in Recipient's possession, retaining a copy of such information only to the extent it is required by law or for corporate governance purposes.

The obligation to protect Confidential Information as set forth herein shall terminate three (3) years from the expiration or termination of the Agreement.

## *(12)   INDEMNIFICATION*

RAS shall be responsible to each Railcar Owner for all work performed by RAS and RAS's subcontractors. RAS shall indemnify and hold each Railcar Owner, and their servicer(s), harmless from all liability, damage, cost or expense, including, without limitation, expenses in prosecuting or defending any claim or suit such as attorney's fees, court costs and other expenses arising out of (i) any failure of RAS or its subcontactors to comply with its obligations under this Agreement; (ii) any claim, whether private or governmental, for personal injury or death, or for loss of or damage to person, property or cargo arising out of or incident to the Services or caused by the negligence or intentional misconduct of RAS or its subcontractors. Each party undertakes promptly to give notice to the other of claims against it or action against it with respect thereto, and RAS agrees not to settle any action without the consent of the applicable Railcar Owner(s), such consent not to be unreasonably withheld or delayed.

Each Railcar Owner (solely for itself and its railcars) shall indemnify and hold RAS harmless from all liability, damage, cost or expense, including, without limitation, expenses in prosecuting or

DocuSign Envelope ID: DCE3BA8C-2385-46C8-AA3F-6CBC48597794

defending any claim or suit such as attorney's fees, court costs and other expenses arising out of any failure of said Railcar Owner to comply with its obligations under this Agreement.

In the event RAS, its employees, agents, representatives and/or subcontractors, enter any Railcar Owner's or their servicer(s)'s facility or any Railcar Owner's railcar in the performance of Services under this Agreement or any activities related thereto, it/they will comply with any and all of the Railcar Owner's or their servicer(s)'s safety, health, security, environmental protection and other rules and regulations pertaining to the facility or railcar.

## (13) INDEPENDENT CONTRACTOR

RAS, and its employees, will serve as an independent contractor hereunder, and not as an employee, partner or agent of any Railcar Owner, and will not by reason of the Agreement, or performance hereunder, have or acquire any rights or claims against any Railcar Owner with respect to medical or other insurance, workmen's compensation, pension or retirement benefits, or other fringe benefits accorded to Infinity employees. RAS shall have no authority to bind or commit any Railcar Owner in any manner whatsoever by reason of the Agreement.

## (14) ASSIGNMENT

RAS shall not assign any of its rights or obligations herein without the prior written consent of all of the Railcar Owners. Any Railcar Owner may assign its rights and obligations herein (a) to an affiliate without RAS's prior consent and shall give notice of such assignment to RAS within ten (10) business days after such assignment (provided, however, that later notice is acceptable if RAS has not suffered any material harm from the delay; and (b) to a non-affiliate with RAS's prior consent not to be unreasonably withheld, conditioned, or delayed.

## (15) GENERAL PROVISIONS

(a) **(Variation):** A variation of this Agreement must be in writing and signed by all affected parties.

(b) **(Notices):** Any notice or other communication must be addressed as shown at the commencement of this Agreement or as specified by the applicable party by subsequent notice.

(c) **(Counterparts):** This Agreement may be executed in any number of counterparts and all counterparts taken together constitute one instrument. Signature delivered by PDF, DocuSign, or other widely used electrobnic means will be deemed to be originals.

(d) **(Waiver):** The failure of any party to enforce any provision of this Agreement or to prosecute any default shall not be considered as a waiver of that provision nor bar prosecution of that default unless so indicated in writing.

(e) **(Severability):** If any provision of this Agreement shall be deemed by any court of competent jurisdiction unenforceable in whole or in part, the remaining provisions hereof shall continue in full force and effect to the greatest extent practicable. The parties shall use their best efforts to resolve by agreement any dispute which may arise as a result of any changes in applicable law or regulations affecting performance of this Agreement.

DocuSign Envelope ID: DCE3BA9C-3385-46C8-AA3F-6CBC4B597794

(f) **(Survival):** All warranties, indemnities, and insurances contained and/or described herein shall survive termination of this Agreement, regardless of the reason for such termination, and shall continue in full force and effect.

(g) **(Intellectual Property, No License, Etc.):** The Railcar Owners' rights in and to all information disclosed hereunder or in connection herewith, by it or on its behalf, and all derivative works thereof, will remain the exclusive property of the Railcar Owners, and neither this Agreement, nor any disclosure of information hereunder or in connection herewith, in any way (i) grants to RAS or any other party any right or license under any copyright, patent, mask work, or trademark now or hereafter owned or controlled by any Railcar Owner, nor any right, permission, or license to create derivative work; (ii) obligates any Railcar Owner to disclose any information, perform any work, enter into any license, business arrangement, or other agreement; (iii) limits any Railcar Owner from developing, manufacturing, or marketing products or services of any kind; or (iv) limits any Railcar Owner from assigning or reassigning its employees in any way or from entering into any business relationship with any third party.

## (16)  ENTIRE AGREEMENT

The terms and provisions herein contained constitute the entire Agreement between each Railcar Owner (solely for itself and its railcars) and RAS in respect of its subject matter.  No agreement or understanding which alters or extends the Agreement shall be binding upon any party unless in writing and duly signed by the party to be charged. The Agreement is to be governed and interpreted by the laws of the State of Illinois, without giving effect to the principles of conflict of laws thereof.

## (17)  NOTICES AND INVOICES

To any Railcar Owner:          Infinity Transportation Equipment Leasing, LLC
                               Attention:  Mechanical and Operations
                               1355 Peachtree Street NE
                               Suite 750, South Tower
                               Atlanta, GA 30309

To RAS:          Mr. Michael Calomino
                 RAS Data Services, Inc.
                 1510 Plainfield Road
                 Suite 3
                 Darien, IL  60561

## *(18)    AUTHORIZED SIGNATURES*

This Management Services Agreement is signed for and executed as an Agreement on behalf of:

**Each Railcar Owner**
by its authorized representative,
Infinity Transportation Equipment Leasing, LLC,
As Servicer

_____          Jeffrey Edelman
Authorized Representative                    _____
                                             Name (please print)


SVP                                          12/30/2021
_____          _____
Title                                        Date



**RAS Data Services, Inc.**
by its authorized representative:

_____          Michael Calomino
Authorized Representative                    _____
                                             Name (please print)


President & CEO                              12/30/2021
_____          _____
Title                                        Date

DocuSign Envelope ID: DCE3BA9C-3385-46C8-AA3F-6CBC48597694

# Exhibit "A" Description of Systems and Technology

❏ ***carMARQS (car Maintenance And Repair Query System),*** an internet based application which allows the user 24/7/365 access to your maintenance costs and detail technical data via an easy to use query page.

❏ ***fleetVIEW,*** an internet based application which allows the car owner 24/7/365 access to static information for specific cars and groups.

❏ ***reportVIEW,*** an internet based application which allows the car owner to select and review or download static reports from the current account month, or reports archived from previous account months.

❏ ***repairSMART (repair Shop Management And Reporting Technology),*** An internet based application jointly accessible by RAS, the car owner and contract shop personnel. The system provides the means to post estimates for cars that have been directed to shops for repairs, manage such estimates in real time, monitor throughput, and create electronic invoices.

DocuSign Envelope ID: DCE3BA0C-3385-46C8-AA3F-6CBC48597794

**Annex 1**

**Form of Railcar Owner Joinder Agreement**

This Railcar Owner Joinder Agreement (this *"Joinder"*) is made as of _____, 202_ (the *"Joinder Effective Date"*) by _____ (the *"Joining Railcar Owner"*).

Whereas, reference is made to that certain ***MANAGEMENT SERVICES AGREEMENT*** among **RAS Data Services, Inc.**, and each of **Infinity Transportation 2022, LLC**, **Infinity Transportation 2020-1, LLC**, **Infinity Transportation 2019-1, LLC**, **Infinity Transportation 2019-2, LLC**, **Infinity Transportation 2018-1, LLC**, **Infinity Transportation 2018-2, LLC**, **Infinity Transportation 2016-1, LLC**, **Infinity Transportation III LLC**, and **ARC Rail 2013-1, LLC**, effective as of January 1, 2022 (as the same has been and may hereafter be modified, supplemented, amended or restated, the *"Management Services Agreement"*).  Capitalized terms defined in the Management Services Agreement are used herein as defined therein.

**Agreement**

In consideration of RAS and the Railcar Owners permitting the Joining Railcar Owner to become a Railcar Owner under the Management Services Agreement, the Joining Railcar Owner agrees that effective as of the Joinder Effective Date it shall become, and shall be deemed to be, solely for itself and its railcars, a Railcar Owner under the Management Services Agreement and agrees that from the Joinder Effective Date and so long as the Joining Railcar Owner remains a party to the Management Services Agreement, such Joining Railcar Owner shall, solely with respect to itself and its railcars, assume the obligations of a Railcar Owner under and perform, comply with, and be bound, respectively, by each of the provisions of the Management Services Agreement which are stated to apply to a Railcar Owner, and shall be entitled to the benefits, rights, and remedies set forth therein.  The Joining Railcar Owner hereby acknowledges that it has heretofore received true and correct copies of the Management Services Agreement (including any amendments or modifications thereof or supplements or waivers thereto) as in effect on the Joinder Effective Date.

[Signature Pages Follow]

DocuSign Envelope ID: DCE3BA0C-2385-46C8-AA3F-6CBC4859779A

In Witness Whereof, the parties hereto have executed this Railcar Owner Joinder Agreement as of the Joinder Effective Date.


Joining Railcar Owner:
[_____]
by its authorized representative,
Infinity Transportation Equipment Leasing, LLC,
As Servicer


_____          _____
Authorized Representative                           Name (please print)


_____          _____
Title                                                        Date



**Acknowledged and Agreed:**

**RAS Data Services, Inc.**
by its authorized representative:


_____          _____
Authorized Representative                           Name (please print)


_____          _____
Title                                                        Date

**SaaS Terms Addendum**

**to January 1, 2022, RAS / Infinity Management Services Agreement**
**(referred to herein as the "Agreement",**
**and RAS Data Services, Inc., referred to herein as the "Supplier",**
**and each Railcar Owner under the Agreement referred to herein as a "Client")**

This Addendum forms a part of, and will be governed by, the terms of the Agreement.  In the event of any conflict between the terms hereof and the terms of the Agreement, the terms hereof will prevail.  Capitalized terms used in this Addendum that are not defined herein have the meanings given to them in the Agreement.

1. License Terms.

   a. License Grant.  Supplier hereby grants Client and Authorized Users a worldwide, non-exclusive, royalty-free, irrevocable (except to the extent the Agreement is terminable) license to access and use the Systems during the Term and the Transition Assistance Period (if applicable), in connection with the Systems and the Services.

   b. Client Data.  As between Client and Supplier, Client retains all right, title and interest in and to Client Data.  Subject to the terms and conditions of the Agreement, Client grants to Supplier a non-exclusive license to use, copy, store, transmit and display Client Data, in each instance within the Systems and during the Term and the Transition Assistance Period (if applicable), solely for the purpose of providing the Systems and the Services to Client in accordance with the Agreement.

   c. Supplier may solicit and/or Client may provide to Supplier feedback, including suggestions or ideas for enhancements, configuration requests or other recommendations relating to the Systems and the Services ("**Feedback**").  Client retains all right, title and interest in and to such Feedback.  Subject to the provisions of the Agreement, Client grants to Supplier a non-exclusive, non-transferable right to use the Feedback solely in connection with the Agreement, and for no other purpose.  Supplier acknowledges that its use of the Feedback is at its own risk, without any warranty from Client.

2. Proprietary Rights.

   a. Ownership of Deliverables.  All rights, including all  title, and interest in and to all Deliverables and all  materials contained therein will be owned solely and exclusively by Client.  Supplier will assign, and hereby perpetually and irrevocably assigns, to Client, all of its right, title and interest in and to the Deliverables (and all future modifications, Derivative Works and improvements thereto) throughout the world, including all uses in all media now known or in the future developed in any jurisdiction and all lawful means and forms of exploitation now known or in the future developed in any jurisdiction.  In the event the foregoing assignment is not recognized by law, or where Supplier by law retains any recognizable interest in the Deliverable, Supplier will grant and hereby grants to Client and its affiliates an exclusive, unrestricted, worldwide, royalty-free, fully paid-up, transferable, irrevocable, license (with rights to sublicense through multiple tiers of sub-licensees) to use, copy, and display, modify, and create Derivative Works in the Deliverables, and Supplier agrees not to use the Deliverables, except as contemplated under the Agreement, in any manner without the express written consent of Client.

13

b. <u>Further Assurances</u>.  Supplier will take such further actions, and will cause employees, agents, representatives and, if permitted and approved by Client, subcontractors and their respective personnel (collectively, "**Supplier Personnel**") to take such further actions, including the execution and delivery of instruments of conveyance, as may be necessary or appropriate to give full and proper effect to the assignment of Deliverables to Client.  Supplier hereby represents and warrants that it has not entered into any agreement to assign any ownership rights to any third party, including but not limited to Supplier' employees, which may cause the above assignment to be invalid, illegal, unenforceable or limited in any way.  Supplier will cooperate and provide any assistance reasonably necessary for, and will cause Supplier Personnel to cooperate and provide any assistance reasonably necessary for, the preparation, prosecution, perfection, registration, recordation, or defense to any challenge to, any application for registration of any intellectual property rights in any Deliverable.

3. <u>Service Levels</u>.

a.  Supplier will provide the Systems so as to meet or exceed the performance standards designated as "Service Levels" set forth in Attachment 1 hereto (the "**Service Levels**").

b.  Upon reasonable request, , at no additional charge to Client, Supplier will provide Client with up-to-date data regarding Supplier performance of the Systems against the applicable Service Levels.

4. <u>Representations, Warranties and Covenants</u>.

a.  Supplier represents, warrants and covenants that, in addition to the representations and warranties set forth in the Agreement:

i.  The Systems and the Services, Deliverables and any Documentation do not infringe upon or misappropriate any intellectual property rights, other proprietary right or contractual license right of any third party and will be provided to Client free and clear of any claim of third-party infringement of any intellectual property right or other contractual or proprietary right;

ii.  Supplier: (a) is either the owner of, or authorized to use, all information and material provided to Client in connection with the Agreement, including, but not limited to the Systems, web portals, and any Documentation and (b) is fully authorized to grant Client all rights and licenses granted hereunder and under the Agreement;

iii.  With respect to Client networks and the Systems and the Services, Supplier will not insert, introduce or include, or permit, enable or cause any third party to insert, introduce or include, any program code, programming instruction or set of instructions constructed with the ability or the intention to damage, interfere with, interrupt or otherwise affect computer programs, data files or operations in any manner without the authorization, knowledge or approval of any actual or intended user, operator, administrator, publisher, licensor or licensee, or any worms or so called "Trojan Horses" or logic bombs, or any back door, trap door or other access means or portal which would enable an entity or device to access any programs, data, systems or communications devices, without the knowledge or authorization of the owner, operator or user of the programs, data, system or communications devices, or any other code typically designated to be a virus or other form of malicious code (collectively "**Virus**"); and without limiting any other terms or conditions of the Agreement, this Addendum, or the CyberSecurity Addendum, and without limiting the characterization of any violation thereof, an intentional and knowing violation of this subsection will be deemed to be willful misconduct; and

14

DocuSign Envelope ID: DCE3BA0C-3385-46C8-AA3F-6CBC48597794

iv.   The Systems and the Services will conform with any Documentation and be error-free in all material respects.

5.   <u>Data Security and Privacy</u>.

a.   Supplier and Supplier Personnel will comply with data security and privacy standards set forth in the CyberSecurity Addendum.

b.   If Supplier or any Supplier Personnel discover or is notified of a breach of security relating to Client Data or Client Confidential Information in the possession or under the control of Supplier or Supplier Personnel, Supplier will immediately notify Client, and Supplier will promptly investigate and undertake at Supplier' sole cost and expense any and all required and/or appropriate remediation and notification efforts, subject to consultation with and direction from Client, as Client deems appropriate.

6.   <u>Maintenance and Support</u>.   Supplier will provide technical support to Client as reasonably needed for Client to access and utilize the Systems.  Said technical support will be available at least during regular business hours of not less than 8:00 a.m. to 6:00 p.m. Eastern time on weekdays that are not Federal or State legal holidays.  Supplier will use commercially reasonable efforts to promptly resolve accessibility and functionality issues with the Systems.   Supplier will promptly install and implement any available Updates to the Systems.  Supplier will ensure that any Updates to the Systems made during the Term are backwards compatible.

7.   <u>Additional Supplier Obligations – Systems Changes</u>.   Supplier will cause the Systems to evolve and to be modified, enhanced, supplemented and replaced as necessary for the Systems to keep pace with overall improvements and technological advances in the provision of related services in the rail industry, including those changes made in response to regulatory changes affecting the rail industry in the United States.  Supplier will not delete material functions of the Systems that are not replaced by substantially equivalent functionality in the Systems or otherwise offered in other or new products and made available to Company as provided hereunder.  Without limiting the foregoing sentence, if Supplier deletes functions from the Systems and offers those functions in other or new products, the portion of those other or new products which contain the functions in question, or the entire product if the functions cannot be separated out, will be provided to Client under the terms of the Agreement at no cost to Client and will be covered by the maintenance and support provisions set forth herein, at no additional cost to Client. If the Systems are replaced, renamed or re-branded for any reason, Client will be entitled to the same license to use the replacement, renamed or re-branded Systems as Client currently has with respect to the Systems at no additional charge to Client so long as the renamed or re-branded product is functionally equivalent, at a minimum, to the Systems and the same conditions of use apply to the Systems.

8.   <u>Transition Assistance</u>.   Upon the termination or expiration of the Agreement for any reason, for a period of twelve (12) months from the date of termination or expiration ("**Transition Assistance Period**"), Supplier will assist Client to carry out an orderly transition and/or termination of its use of the Systems and the Services and Client Data to Client or its designee (the "**Transition Assistance Services**").   Client will compensate Supplier for the Transition Assistance Services at the rate equal to the Monthly Fee per month.  As part of the Transition Assistance Services, Supplier will deliver to Client at no charge a complete copy of the Client Data in such form and format as reasonably requested by Client.  The quality and level of performance of the Systems and the Services during the Transition

DocuSign Envelope ID: DCE3BA0C-3385-46C8-AA3E-6CBC48597794

Assistance Period will not be degraded as compared to the quality and level of performance of the Systems and the Services prior to such extension.

9.   Browser Compatibility.  Supplier will: (a) provide Client with at least three (3) months' prior written notice of any change or modification to the Microsoft Internet Explorer, Google Chrome, Mozilla Firefox and/or Safari browsers supported by Supplier and (b) maintain support for the latest versions (includes all versions supported by Microsoft) of the Microsoft Internet Explorer and Google Chrome browsers.

10.  [Reserved].

11.  Indemnification.   In addition to and without limiting or otherwise affecting Supplier's indemnification obligations under the Agreement, Supplier will defend, indemnify and hold harmless Client, its affiliates and each of their respective third party service providers, officers, directors, employees, contractors, agents, representatives, successors and assigns ("**Client Indemnitees**") from and against any and all third party claims, losses, damages, suits, fees, judgments, costs and expenses arising, alleged, or asserted anywhere in the world (each, a "**Claim**" and collectively, "**Claims**"), including reasonable costs and attorneys' fees incurred in responding to such Claims, that Client and/or an Client Indemnitee may suffer or incur arising out of or in connection with: (a) any claim that the Deliverables or any Systems and the Services infringes or otherwise violates any patent, copyright, trade secret, trademark, or other third party intellectual property right of any person or entity or Client's infringement or violation of any such rights to the extent caused by such infringement or violation by Supplier or Supplier Personnel; (b) any breach by Supplier or any Supplier Personnel of the CyberSecurity Addendum, the "Data Security and Privacy" Section of this Addendum, or the "Confidential Disclosure" Section of the Agreement; or (c) any failure by Supplier or any Supplier Personnel to comply with applicable law.  If Client is enjoined from continued use of any infringing materials or technology, then Supplier will (at its expense and option): (i) obtain the license or right for Client to continue to use the materials or technology or (ii) modify the materials or technology to eliminate the infringement.

12.  Definitions.

a.   "**Authorized User**" means (i) any employee, contractor, agent or representative of Client or of a third-party service provider to Client and (ii) any other individual user who has a Client email address.

b.   "**Client Data**" means any data, information, or material that is (i) provided, submitted and/or otherwise inputted into the Systems by Client and/or Authorized Users; (ii) generated by Client and/or Authorized Users in the course of utilizing the Systems and the Services; (iii) pertains to Client and/or any Authorized User and is stored by the Systems; and/or (iv) all derivatives and transformations of the foregoing categories (i)-(iii).

c.   "**Client Property**" will mean any and all property belonging to Client or an affiliate of Client and provided to (or access to which is provided to Supplier in connection with the Agreement), including: (i) all documents, materials and tangible property, including all tangible embodiments of Client Confidential Information, and all reports, communications, designs, data, analyses, , tools, digital images, methodologies, specifications, models, prototypes, samples, and any other materials including improvements, enhancements and Derivative Works thereto and thereof; (ii) Client Confidential Information; (iii) Feedback; (iv) Deliverables; and (v) Client Data.

16

DocuSign Envelope ID: DCE3BA9C-3385-46C8-AA3F-6CBC4859773A

d.   "**Deliverables**" will mean reports, presentations, communications, data, and other work product to be provided to Client by Supplier through the Systems and from performance of the Services.

e.   "**Derivative Work**" will mean a work that is based upon one or more preexisting works and that, if prepared without the authorization of the owner of the preexisting work, would constitute a copyright infringement, or any improvement, enhancement, modification or adaptation of or to a preexisting work.

f.   "**Documentation**" means any user guides, user manuals and other written documentation describing the Systems that Supplier makes available to Client or an Authorized User.

g.   "**Enhancement**" means any upgrade of any existing version of the Systems in order to add new or improve existing modules or features and/or provide adjustments to a previous release.

h.   "**Maintenance Release**" means corrections, patches, and fixes to and of the Systems for the purposes of resolving issues with the Systems.

i.   "**Update**" means a Maintenance Release or Enhancement.

j.   Use of the term "including" means "including without limitation".

## ATTACHMENT 1 to SaaS Terms Addendum

## SERVICE LEVELS

Capitalized terms used and not defined herein have the meanings given to them in the Agreement or the SaaS Terms Addendum, as applicable.

1.      Availability.

1.1      During the Term, Supplier will achieve an Uptime Percentage of at least 99.95% during each Uptime Measurement Period, as calculated below.

1.2      "Downtime" occurs whenever, during the Uptime Measurement Period, there are one or more instances during which any System is inoperable or inaccessible to Authorized Users or a significant portion of any System is inoperable or inaccessible and the result is such that for all practical purposes such System is inoperable or inaccessible to Authorized Users. Downtime does not include periods of inoperability or inaccessibility due to Scheduled Maintenance.

1.3      "Scheduled Maintenance" means such time as the applicable System is inoperable or inaccessible to Authorized Users for purposes of planned maintenance by Supplier. Maintenance by Supplier will only be deemed "Scheduled Maintenance" if (i) Supplier has provided Client with advance written notice, not less than four (4) Business Days, of planned changes to the Systems, including a basic description of the maintenance to be performed, and (ii) such maintenance is not during regular business hours (7:00 a.m. to 5:00 p.m. Eastern time on weekdays that are not Federal or State legal holidays).

1.4      "Uptime Base Hours" are the total number of hours during the Uptime Measurement Period over which Uptime Hours and Downtime will be calculated. The Uptime Base Hours during each week will be 24 hours a day, seven days a week and shall exclude Scheduled Maintenance. Based on the foregoing, the total number of Uptime Base Hours for an entire Uptime Measurement Period will be the total number of hours in the calendar month of that Uptime Measurement Period, less Scheduled Maintenance.

1.5      "Uptime Hours" are determined by subtracting the total Downtime from the Uptime Base Hours. Uptime Hours = Uptime Base Hours – Downtime.

1.6      "Uptime Measurement Period" is the recurring period of time over which each Uptime Percentage will be calculated. The measurement period for determining Uptime Percentage is a calendar month.

1.7      "Uptime Percentage" is determined by dividing the Uptime Hours by the Uptime Base Hours, and multiplying the result by 100. Uptime Percentage = (Uptime Hours/Uptime Base Hours) x 100.

**CyberSecurity Addendum**

**to January 1, 2022, RAS / Infinity Management Services Agreement**
**(referred to herein as the "Agreement",**
**and RAS Data Services, Inc., referred to herein as the "Vendor",**
**and each Railcar Owner under the Agreement referred to herein as a "Customer")**

**CYBERSECURITY REQUIREMENTS AND COMPLIANCE**

**ARTICLE 1: GENERAL**

Beginning on the effective date of the Agreement and continuing as long as Vendor or any Material Subcontractor (i) accesses, controls, possesses, stores, transmits, or processes Customer Data, (ii) accesses, uses, hosts, or manages Customer Systems, or (iii) uses Vendor Systems to provide services to Customer (each as defined below), Vendor will comply with the obligations set forth in this Addendum and comply with all cybersecurity laws, rules, and regulations applicable to Vendor and its performance under the Agreement. If there is any conflict between this Addendum and the Agreement, the terms of this Addendum shall control. The parties agree that this Addendum is a material part of the Agreement.

**ARTICLE 2: CONFIDENTIAL INFORMATION**

**No Exclusion:**  Any exclusion from the definition of Confidential Information contained in the Agreement will not apply to any personal data, personally identifiable information, personal information or similar data under applicable laws, regulations or guidance relating to the privacy and/or security of such data.

**ARTICLE 3: INFORMATION SECURITY**

3.1     **Definitions**. (i) "**Customer Data**" means (A) any information or data provided or made available by, or relating to, Customer or its affiliates and/or its or their respective former, current or prospective customers, clients, employees, vendors or consultants, (B) Personal Data as defined in Article 4 (Privacy and Data Protection), and (C) any information or data derived from any of the foregoing, in each case that is collected, accessed, used, stored, transmitted or otherwise processed by Vendor (or its agents or subcontractors); (ii) "**Information Systems**" means a discrete set of electronic information resources organized for the collection, processing, maintenance, use, sharing, dissemination or disposition of electronic information, as well as any specialized system such as industrial/process controls systems, telephone switching and private branch exchange systems, and environmental control systems and the facilities in which they are hosted; (iii) "**Customer Systems**" means Information Systems owned or provided by Customer or its other vendors and made available to Vendor; and (iv) "**Vendor Systems**" means Information Systems, other than Customer Systems, that are used by Vendor (including any of its agents and/or subcontractors) to collect, access, use, store, transmit or otherwise process Customer Data, to interface, integrate, or otherwise connect with Customer Systems, or to perform its other obligations under the Agreement.

3.2     **Security Safeguards**.  Vendor represents, warrants and covenants that it will maintain and comply with an appropriate comprehensive information security program, including policies and procedures, to ensure the confidentiality, security, integrity and availability of the Customer

19

DocuSign Envelope ID: DCE3BA8C-3385-46C8-AA3F-6CBC48597794

Data and Vendor Systems and that includes administrative, technical and physical safeguards (including reasonable disposal and degaussing measures) to safeguard Customer Data and Vendor Systems against unauthorized access, use, disclosure, modification, unavailability and deletion, and that Vendor will operate and maintain such safeguards in accordance with the requirements of this Addendum, all applicable laws and regulations and (if more protective) industry best practices. Without limiting the foregoing, such safeguards shall include: (i) use of up-to-date cybersecurity technologies and practices, including firewalls, and other access controls and monitoring (e.g., establishment of forced routine changes to passwords, appropriate logs and reports regarding access),; (ii) locked and restricted access (authorized Vendor personnel only) to critical work areas (including data centers); (iii) background checks on employees, consultants and other personnel with access to Customer Data or Vendor Systems; (iv) restriction on access to and use and copying of Customer Data on a "need-to-know" basis and only at or from authorized locations; (vi) regular monitoring of the transport and storage of Customer Data and the associated Vendor Systems; (v) due diligence and regular monitoring (including relating to financial and operational stability, reputation, security and technical abilities) of consultants and subcontractors performing Services, working on Vendor Systems and/or facilities or working on Customer Systems and/or facilities; (vi) logical segregation of Customer Data from other information and/or data accessed, stored or hosted by Vendor (or any of its subcontractors or other third party); (vii) ethical walls and internal procedures when providing Services to Customer or any third party to prevent breach of confidentiality and to avoid any conflict of interest; (viii) security measures to manage (including the means to remotely wipe) mobile devices that transmit, store or process Customer Data; and (ix) promptly upon termination of employment or engagement, as applicable, of Vendor personnel with access to Vendor Systems, Customer Data and/or Customer Systems, disabling all such access and (if applicable) notifying Customer to disable any Customer-controlled access methods or permissions with respect to such terminated personnel. Vendor will promptly provide such information in its possession regarding its information security systems, policies and procedures as Customer may reasonably request, including relating to Vendor's due diligence and monitoring measures of consultants and subcontractors. Vendor shall, upon Customer's request, provide Customer with a list of the location(s) (including countries) where Customer Data is or will be collected, accessed, used, stored or otherwise processed by Vendor (or its agents or subcontractors). Vendor agrees that Customer Data will not be collected, accessed, used, stored or otherwise processed by Vendor (or its agents or subcontractors) in any countries, except the countries that Customer approves of either in writing or via a feature made available to Customer on the Vendor System.

3.3 **Use of Customer Data and Customer Systems**. Vendor will use Customer Data and Customer Systems only as necessary to provide the Services under the Agreement and in accordance with Article 8 (Privacy and Data Protection), and will act only as permitted in writing by Customer in relation thereto. As between Customer and Vendor, Customer retains all right, title and interest in and to all Customer Data and Customer Systems.

3.4 **Breach Notification and Remediation Requirements**.

3.4.1. If Vendor learns or has reason to believe that: (A) there has been unauthorized access, use, modification or deletion of Customer Data, or (B) there has been unauthorized access or use of Customer Systems or Vendor Systems (each, a "**Cybersecurity Event**"), Vendor will promptly, but in no event later than twenty-four (24) hours from becoming aware of the Cybersecurity Event, provide notice of the Cybersecurity Event to Customer. Such notice must be in writing or sent to an email address approved in writing by Customer and must include all material details of the Cybersecurity Event, which material details Vendor shall retain for at least three (3) years from the date of such notice.

DocuSign Envelope ID: DCE53BA9C-3385-46CB-AA3E-6CBC48597794

3.4.2 Vendor will: (A) promptly use commercially reasonable efforts to contain, control and remediate any Cybersecurity Event to prevent future unauthorized access to or misuse of Customer Data, Customer Systems or Vendor Systems, and (B) provide updates to Customer, upon request, relating to the investigation and resolution of the Cybersecurity Event.

3.5 **Disposition of Customer Data**. Upon request by Customer (which may be made via any feature or functionality made available by Vendor in its services) and upon termination or expiration of the Agreement or any Statement of Work for any reason, at no cost to Customer, Vendor will promptly return to Customer all copies of Customer Data in Vendor's possession or control, and such Customer Data may be returned via any feature or functionality made available by Vendor in its services from which Customer Data may be downloaded or by delivering to Customer physical storage media (e.g., hard drives or disks) containing Customer Data; provided, in all cases, such Customer Data will be in a format so that such Customer Data may be accessed, understood, searched and manipulated by Customer via commercial off-the-shelf software or such proprietary tools as provided by Vendor at no cost in perpetuity. Promptly thereafter, with Customer's prior written approval or instruction (which may be given via any feature or functionality made available by Vendor in its services), Vendor shall destroy and/or delete all copies of Customer Data in Vendor's possession or control using means and methods that prevent unauthorized access to, use of, or recovery of the Customer Data. Upon request by Customer, an officer of Vendor will promptly certify in writing to Customer that all such Customer Data has been, as applicable, returned and/or destroyed and deleted.

3.6 **Attestation**. No more than once annually, Vendor will provide Customer with a written attestation signed by an officer of Vendor that Vendor complies with this Article 3. Upon request, Vendor shall arrange for appropriate personnel of Vendor to meet, either in person or via call, with Customer to review the underlying details of such attestation of compliance with this Article 3.

3.7 **Inspections/Reviews**. Vendor will provide to Customer, Customer's auditors (including internal audit staff and external auditors) and regulators or other law enforcement agents access at all reasonable times, after providing Vendor with at least ten (10) days' advance notice (except in the event of audits or investigations by regulators or other law enforcement agents, or investigations of reasonable suspicion of misappropriation, fraud or business irregularities of a potentially criminal nature, or relating to Customer data protection requirements), to any facility or part of a facility at which either Vendor or any of Vendor's Personnel are providing the Services (including Vendor Systems) and to data and records relating to the Services and/or a Cybersecurity Event for the purpose of performing audits designed to enable Customer or regulators or other law enforcement agents to confirm that Vendor is meeting all applicable information privacy and security requirements, and regulatory and other legal requirements. Where Vendor uses any multi-tenant cloud or "-as-a-Service" provider (such as Amazon, Google, or Azure) ("**Cloud Providers**") as part of the Vendor Systems, and such Cloud Providers reasonably restrict access for customer audits, then as an alternative, Vendor will demonstrate to Customer (or its agents or regulators) Vendor's environment and/or operations at the Cloud Provider in order for Customer to ensure that such Cloud Provider's security configurations and controls (including policies and procedures) substantially conform to the requirements of this Addendum and are at least as strong as best industry practices for such services. In the event Customer notifies Vendor of any deficiencies or noncompliance identified in this Section 3.7, Vendor will remediate such deficiencies and/or noncompliance. Customer will have the right to conduct follow-up audits and demonstrations, as applicable, to confirm remediation.

3.8 **Due Diligence Questionnaires**. Without limiting any other provision of the Agreement (including any exhibit or Statement of Work), if Vendor has provided responses to Customer's information security and/or security architecture questionnaire(s) or other written inquiries,

Vendor will comply with Vendor's information security policies, plans, procedures, standards and other information set forth or referenced in Vendor's responses to such information security and/or security architecture questionnaire(s) or other written inquiries and any responses to any follow up questions related thereto, and any updated information provided by Vendor; provided, however, that in no event will Vendor's performance of its security obligations be less protective of Customer and Customer Data than that which is otherwise required by this Addendum, applicable laws and regulations, or industry best practices. Vendor agrees that Customer may periodically deliver an information security and/or security architecture questionnaire(s), and Vendor agrees to promptly and completely respond to the questionnaire. In addition, Vendor will promptly provide such information regarding Vendor's information security systems, policies, plans, procedures, and standards as Customer may request from time to time.

3.9     **[Reserved]**.


**ARTICLE 4: PRIVACY AND DATA PROTECTION**

In the event that Vendor collects, accesses, uses, stores, transmits, discloses, makes available, retains, or otherwise processes (collectively, "**Processing**" and its cognates) any information that, on its own or combined with other information, (i) identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household; (ii) relates to an identified or identifiable natural person; or (iii) is other information not covered by the foregoing but that is information protected as personal data, personal information, personally identifiable information or similar information (collectively, "**Personal Data**") under applicable laws, regulations or guidance relating to privacy or data protection (collectively, "**Privacy Laws**") relating to former, current and prospective clients, customers, partners, employees or contractors of Customer and its affiliates, or any other individuals to whom the Personal Data relates (collectively, "**Data Subjects**"), Vendor agrees that (1) the subject-matter, nature and purpose of the Processing shall be as contemplated by the Agreement (including the service description), (2) the duration of Processing of Personal Data shall be limited to the term of the Agreement unless otherwise stated in the Agreement and (3) for the purpose of applicable Privacy Laws of the United Kingdom and European Union, the type of Personal Data to be Processed hereunder can be described as business contact information and any other types of Personal Data Processed by Vendor on behalf of Customer within the scope of the Agreement. Without limiting any provision of the Agreement not relating to Personal Data, Vendor shall (unless Customer and Vendor have entered into a separate agreement addressing Personal Data in which case the terms more protective of Personal Data shall apply): (I) Process Personal Data, where relevant to the applicable Privacy Laws, as a service provider or as processor on behalf of Customer as controller on Customer's written instructions, only for the specific purpose of performing the Services, only to the extent necessary to perform its obligations under the Agreement, and not for any other purpose (including not for any other commercial purpose); (II) permit Personal Data to be Processed by a third party on behalf of Customer only with Customer's prior written consent and subject to the further conditions in Article 5 (Subcontracting); (III) ensure that persons and/or entities authorized to Process Personal Data have contractually committed themselves to the confidentiality, security and use/access restrictions regarding Personal Data set forth in this Addendum  or are under a statutory duty of confidentiality, security and use/access restrictions relating to Personal Data; (IV) take appropriate administrative, technical, organizational and physical measures, including at a minimum those set out in Section 3.2 (Security Safeguards), to safeguard against the accidental or unlawful destruction, loss, alteration, unauthorized disclosure or use of, or access to, Personal Data transmitted, stored or otherwise Processed by Vendor (each, a "**Personal Data Breach**"); (V) comply with Section 3.4.1 (Breach Notification and Remediation Requirements) in respect of any actual or suspected Personal Data Breach as if such were a Cybersecurity Event, and provide further

information as requested by Customer; (VI) make available to Customer all information necessary to demonstrate compliance with Privacy Laws and Vendor's obligations in this Addendum regarding Personal Data and allow for and contribute to audits (including inspections) conducted by Customer or an auditor mandated by Customer; (VII) promptly assist the Customer with responding to and comply with requests from Data Subjects in relation to their Personal Data in accordance with Privacy Laws and promptly forward to the Customer communications from Data Subjects, regulatory bodies and other third parties concerning the Personal Data and not respond to or act on such communications without the Customer's prior agreement; (VIII) transfer Personal Data out of the European Economic Area and/or the United Kingdom only on Customer's written instructions and subject to implementing appropriate safeguards to protect Data Subjects' rights, for example by agreement of standard contractual clauses in accordance with applicable Privacy Law or by maintaining its certification under and observing the principles of the US and/or Swiss Privacy Shield; (IX) as directed by Customer, return to Customer or delete in accordance with Section 3.5 (Disposition of Customer Data) all Personal Data (and all copies thereof) in Vendor's possession upon the earlier to occur of Customer's request, end of the Processing activities, when no longer needed for the purpose of the Agreement, or termination or expiry of the Agreement, except to the extent permitted by applicable Privacy Laws in which case Vendor shall continue to observe the privacy, confidentiality and security obligations in this Addendum; and (X) comply with all applicable Privacy Laws.

## ARTICLE 5: SUBCONTRACTING

Vendor may, in the ordinary course of business and without obtaining Customer's prior written approval, utilize third party services or products that are not dedicated to performance of Services to Customer or that are not a material aspect of the Services under the Agreement.  In all other cases, Vendor will obtain the prior written approval of Customer for all Vendor subcontractors performing Services under the Agreement.  Without limiting the foregoing, Vendor must obtain Customer's prior written approval before Vendor uses any subcontractor or agent: (i) to access, store or process (A) unencrypted Customer Data or (B) encrypted Customer Data to which the subcontractor has access to encryption keys or other means to allow decryption of Customer Data, and/or (ii) to access, use, host, or manage, as applicable, Customer Systems or Customer facilities and/or (iii) communicate with any client or customer of Customer or its affiliates (each such subcontractor or agent described in (i), (ii) and (iii) above and/or any third party dedicated to the performance of Services for Customer or that provides a material aspect of Vendor's Services, a "**Material Subcontractor**").  Notwithstanding any approval by Customer of any subcontractor, Vendor will (i) remain fully liable for the acts and omissions of its subcontractors and agents as if such acts or omissions were committed by Vendor and (ii) enter into and maintain written agreements with all subcontractors that include terms and conditions that are at least as protective of Customer, Customer Systems and Customer Data as this Addendum.

## ARTICLE 6: BUSINESS CONTINUITY AND DISASTER RECOVERY.

6.1    **Business Continuity and Disaster Recovery**.    Vendor represents, warrants and covenants that it will maintain and comply with an appropriate comprehensive business continuity and disaster recovery program, including policies and procedures, to ensure the continuous and uninterrupted operation and availability of the Vendor Systems and Services, and maintain such program in accordance with the requirements of this Addendum, all applicable laws and regulations and (if more protective) industry best practices.  Without limiting the foregoing, such program shall include: (i) business continuity and disaster recovery plans that include information and procedures regarding (A) the location and availability of key personnel and infrastructure, (B) the speed at which personnel and back-up Vendor Systems will be available, and (C) storage of Customer Data and continuity of use of Vendor Systems

DocuSign Envelope ID: DCE3DA9C-3385-46C8-AA3F-6CBC48597794

and Services; (ii) regular periodic backups of Vendor Systems and Customer Data; and (iii) upon reasonable request, providing reasonable summary information to Customer about  such plans.

6.2   **Occurrence of an Event**.  In the event of a business continuity and/or disaster recovery event, Vendor will provide Customer with prompt notice, which in no event will be later than twenty-four (24) hours from the occurrence of such event, details thereof, and actions Vendor is taking and/or any actions that Customer may take to mitigate and/or resolve the impact of such event.   Notwithstanding the foregoing, Vendor agrees to allocate its resources to restoring Customer's use of the Services and access to Customer Data in a manner that is no less favorable to Customer than the allocation of resources to any of its other customers affected by such events.

# EXHIBIT 2

# Infinity Transportation

## *INVOICE*

| INVOICE NUMBER | INVOICE DATE | BILL MONTH | PAYMENT TERMS |
|---|---|---|---|
| ITFX0524RE-OLDC | 05/30/2024 | 05/2024 | DUE UPON RECEIPT |

BILL TO:

MICHAEL SANDERS
OLD CASTLE MATERIALS
1 CHISHOLM TRAIL SUITE 450
ROUND ROCK, TX 78681
USA

To invoice for lessee responsibility car repairs per the terms of your lease agreement:

| | |
|---|---|
| LEASED / SOLD CAR REBUTTAL BILLING -- REPAIRS | $15,809.57 |
| LEASED / SOLD CAR REBUTTAL BILLING -- TAXES | $0.00 |

PLEASE REMIT------------------>  $15,809.57
U.S. FUNDS ONLY

REMIT BY CHECK TO:

RAS Data Services, Inc
*agent for*  *Infinity Transportation*
1510 Plainfield Rd
Suite 3
Darien, IL 60561

REMIT BY WIRE TO:

Bank:   Chase Bank
RTN:    071000013
ACCT:   869730189

FOR QUESTIONS RELATED TO THIS INVOICE, CONTACT
*NEIL SEVERSON*
*RAS DATA SERVICES, INC*
*1510 PLAINFIELD RD*
*SUITE 3*
*DARIEN, IL 60561*
*NSEVERSON@RASDATASERVICES.COM*

<span style="color:darkred">SUMMARY OF REBUTTAL CHARGES  05/2024</span>                                                  **05/30/2024**

ITFX0524RE-OLDC

| INIT | NUMBER | ROAD | REP DATE | SPLC | AMOUNT |
|------|--------|------|----------|------|--------|
| ITFX | 004219 | TGS | 04/09/24 | 684693 | 701.65 |
| ITFX | 004231 | TGS | 04/09/24 | 684693 | 672.88 |
| ITFX | 004249 | TGS | 04/07/24 | 684693 | 292.38 |
| ITFX | 004260 | TGS | 04/09/24 | 684693 | 634.06 |
| ITFX | 004279 | TGS | 04/09/24 | 684693 | 381.73 |
| ITFX | 004302 | TGS | 04/09/24 | 684693 | 1,213.24 |
| ITFX | 004394 | TGS | 04/09/24 | 684693 | 279.59 |
| ITFX | 004424 | TGS | 04/29/24 | 684693 | 744.05 |
| ITFX | 004430 | TGS | 04/09/24 | 684693 | 362.32 |
| ITFX | 004442 | TGS | 04/07/24 | 684693 | 1,226.18 |
| ITFX | 004446 | TGS | 04/29/24 | 684693 | 161.75 |
| ITFX | 004449 | TGS | 04/09/24 | 684693 | 164.96 |
| ITFX | 004461 | TGS | 04/29/24 | 684693 | 245.86 |
| ITFX | 004471 | TGS | 04/29/24 | 684693 | 776.40 |
| ITFX | 004474 | TGS | 04/29/24 | 684693 | 782.87 |
| ITFX | 005830 | TGS | 04/29/24 | 684693 | 226.45 |
| ITFX | 005869 | TGS | 04/09/24 | 684693 | 368.79 |
| ITFX | 005901 | TGS | 04/29/24 | 684693 | 129.40 |
| ITFX | 005912 | TGS | 04/29/24 | 684693 | 226.45 |
| ITFX | 005925 | TGS | 04/29/24 | 684693 | 142.34 |
| ITFX | 005946 | TGS | 04/09/24 | 684693 | 452.90 |
| ITFX | 005983 | TGS | 04/09/24 | 684693 | 478.78 |
| ITFX | 005984 | TGS | 04/29/24 | 684693 | 368.79 |
| ITFX | 005986 | TGS | 04/29/24 | 684693 | 194.10 |
| ITFX | 014511 | TGS | 04/29/24 | 684693 | 795.81 |
| ITFX | 014514 | AWRR | 04/25/24 | 683650 | 3,785.84 |

15,809.57

# EXHIBIT 3

| Cash Received Month | 06/2025 |
| --- | --- |

| Month | BILL_NUMBER | BILLED_ROAD | DETAIL_SOURCE | CASH_RECEIVED |
| --- | --- | --- | --- | --- |
| 10/2024 | ITFX1024RE-KUTC | KUTC | RE | $1,332.16 |
| 12/2024 | ITFX1224RE-KUTC | KUTC | RE | $250.39 |
| 01/2025 | ITFX0125RE-CARB | CARB | RE | $112.73 |
| | ITFX0125RE-GLEN | GLEN | RE | $2,084.29 |
| | ITFX0125RE-KUTC | KUTC | RE | $250.39 |
| 02/2025 | ITFX0225RE-COMP | COMP | RE | $2,671.08 |
| | ITFX0225RE-DIVI | DIVI | RE | $2,138.65 |
| | ITFX0225RE-KBXR | KBXR | RE | $5,757.74 |
| | ITFX0225RE-KUTC | KUTC | RE | $530.56 |
| | ITFX0225RE-MIDR | MIDR | RE | $2,971.78 |
| 03/2025 | ITFX-032025BNSF | BNSF | DE | $73,519.00 |
| | | | CB | $1,345.05 |
| | ITFX0325RE-ABCC | ABCC | RE | $1,056.06 |
| | ITFX0325RE-BART | BART | RE | $2,313.34 |
| | ITFX0325RE-BUNG | BUNG | RE | $2,846.01 |
| | ITFX0325RE-CCLF | CCLF | RE | $8,962.71 |
| | ITFX0325RE-GALK | GALK | RE | $1,743.14 |
| | ITFX0325RE-IPC3 | IPC3 | RE | $12,760.96 |
| | ITFX0325RE-IPC5 | IPC5 | RE | $547.73 |
| | ITFX0325RE-KBXR | KBXR | RE | $14,558.67 |
| | ITFX0325RE-KUTC | KUTC | RE | $768.23 |
| | ITFX0325RE-LCAL | LCAL | RE | $186.78 |
| | ITFX0325RE-LEHC | LEHC | RE | $12.98 |
| | ITFX0325RE-PNGC | PNGC | RE | $25,180.87 |
| | ITFX0325RE-WATC | WATC | RE | $750.01 |
| | ITFX0325RE-WSOR | WSOR | RE | $451.55 |
| 04/2025 | CAIX-042025CN | CN | CB | $18.48 |
| | CAIX-042025CSXT | CSXT | JR | $11,716.29 |
| | | | CB | $95.40 |
| | | | DM | $1,118.43 |
| | CAIX-042025NS | NS | CB | $7,647.35 |
| | CAIX-R0325UP | UP | CB | $33.24 |
| | | | DM | $1,156.55 |
| | | UP | CB | $4,312.42 |
| | ITFX-042025A012 | A012 | CB | $251.27 |
| | ITFX-042025CN | CN | CB | $73.39 |
| | ITFX-042025CP | CP | CB | $134.24 |
| | ITFX-042025CSXT | CSXT | CB | $945.29 |
| | ITFX-042025GTW | GTW | CB | $44.30 |
| | ITFX-042025KCS | KCS | CB | $127.47 |
| | ITFX-042025NS | NS | CB | $6,891.43 |
| | | NS | JR | $4,744.89 |
| | ITFX-042025UP | UP | JR | $30,522.86 |
| | ITFX-042025WC | WC | CB | $18.48 |
| | ITFX0425RE-ADSX | ADSX | RE | $5,279.77 |
| | ITFX0425RE-ARMI | ARMI | RE | $307.84 |
| | ITFX0425RE-BART | BART | RE | $4,293.13 |
| | ITFX0425RE-CCLF | CCLF | RE | $1,039.91 |
| | ITFX0425RE-CCLX | CCLX | RE | $46,828.57 |
| | ITFX0425RE-CRHC | CRHC | RE | $1,394.23 |
| | ITFX0425RE-D525 | D525 | RE | $828.39 |
| | ITFX0425RE-DAKK | DAKK | RE | $42,783.42 |
| | ITFX0425RE-DIVI | DIVI | RE | $1,651.76 |

| | | | | |
|---|---|---|---|---|
| 45748 | ITFX0425RE-EXCL | EXCL | RE | $3,209.38 |
| | ITFX0425RE-FERP | FERP | RE | $1,105.79 |
| | ITFX0425RE-FETG | FETG | RE | $149.46 |
| | ITFX0425RE-FICE | FICE | RE | $1,239.41 |
| | ITFX0425RE-GATX | GATX | RE | $57.15 |
| | ITFX0425RE-GLEN | GLEN | RE | $1,668.40 |
| | ITFX0425RE-IMRY | IMRY | RE | $17,772.62 |
| | ITFX0425RE-IPC4 | IPC4 | RE | $27.54 |
| | ITFX0425RE-IPPR | IPPR | RE | $17.08 |
| | ITFX0425RE-JBSU | JBSU | RE | $3,263.20 |
| | ITFX0425RE-LAFG | LAFG | RE | $36.21 |
| | ITFX0425RE-LHAZ | LHAZ | RE | $703.67 |
| | ITFX0425RE-LHNA | LHNA | RE | $184.58 |
| | ITFX0425RE-LPAC | LPAC | RE | $198.93 |
| | ITFX0425RE-MACI | MACI | RE | $3,767.56 |
| | ITFX0425RE-MDW | MDW | RE | $853.71 |
| | ITFX0425RE-MSPI | MSPI | RE | $1,267.42 |
| | ITFX0425RE-NDPR | NDPR | RE | $382.04 |
| | ITFX0425RE-SESM | SESM | RE | $302.81 |
| | ITFX0425RE-TIMB | TIMB | RE | $34.16 |
| | ITFX0425RE-USSL | USSL | RE | $510.21 |
| | ITFX0425RE-YARA | YARA | RE | $231.89 |
| | SNC-042025CSXT | CSXT | CB | $68.54 |
| | SNC-042025NS | NS | CB | $33.79 |
| 05/2025 | CAIX-052025CIC | CIC | CB | $1,394.08 |
| | CAIX-052025RCPE | RCPE | CB | $276.14 |
| | ITFX0525RE-A078 | A078 | RE | $42,531.92 |
| | ITFX0525RE-ABCC | ABCC | RE | $4,222.17 |
| | ITFX0525RE-AGR | AGR | RE | $36,410.39 |
| | ITFX0525RE-APEX | APEX | RE | $6,053.94 |
| | ITFX0525RE-AR | AR | RE | $248.70 |
| | ITFX0525RE-ARBR | ARBR | RE | $47,138.21 |
| | ITFX0525RE-ARMI | ARMI | RE | $170.81 |
| | ITFX0525RE-AURO | AURO | RE | $36,035.95 |
| | ITFX0525RE-BAYL | BAYL | RE | $3,458.91 |
| | ITFX0525RE-BRUN | BRUN | RE | $83.37 |
| | ITFX0525RE-BYPI | BYPI | RE | $129.86 |
| | ITFX0525RE-CANPA | CANP | RE | $1,479,980.53 |
| | ITFX0525RE-CGR | CGR | RE | $248.70 |
| | ITFX0525RE-CIC | CIC | RE | $1,024.86 |
| | ITFX0525RE-D525 | D525 | RE | $112.03 |
| | ITFX0525RE-DOMJ | DOMJ | RE | $854.05 |
| | ITFX0525RE-DREX | DREX | RE | $5,789.29 |
| | ITFX0525RE-EXXX | EXXX | RE | $2,132.53 |
| | ITFX0525RE-FGLK | FGLK | RE | $854.05 |
| | ITFX0525RE-FICE | FICE | RE | $1,522.26 |
| | ITFX0525RE-HELM | HELM | RE | $44,338.31 |
| | ITFX0525RE-HESR | HESR | RE | $1,354.88 |
| | ITFX0525RE-ICKX | ICKX | RE | $220.66 |
| | ITFX0525RE-IMCX | IMCX | RE | $9,230.73 |
| | ITFX0525RE-IORY | IORY | RE | $1,027.26 |
| | ITFX0525RE-KOMS | KOMS | RE | $2,287.35 |
| | ITFX0525RE-KYLE | KYLE | RE | $8,190.77 |
| | ITFX0525RE-LRWN | LRWN | RE | $7,288.37 |
| | ITFX0525RE-MALT | MALT | RE | $343.01 |
| | ITFX0525RE-MSPI | MSPI | RE | $163.79 |
| | ITFX0525RE-MWCP | MWCP | RE | $1,855.54 |
| | ITFX0525RE-MWSM | MWSM | RE | $11,452.69 |

| | | | | |
|---|---|---|---|---|
| 45778 | ITFX0525RE-POET | POET | RE | $1,746.14 |
| | ITFX0525RE-PSCM | PSCM | RE | $76.93 |
| | ITFX0525RE-RAHR | RAHR | RE | $531.60 |
| | ITFX0525RE-RCPE | RCPE | RE | $678.73 |
| | ITFX0525RE-ROAN | ROAN | RE | $325.23 |
| | ITFX0525RE-RSOR | RSOR | RE | $2,850.12 |
| | ITFX0525RE-SARC | SARC | RE | $107.04 |
| | ITFX0525RE-SAVA | SAVA | RE | $1,270.58 |
| | ITFX0525RE-SHIN | SHIN | RE | $11,242.31 |
| | ITFX0525RE-SOMC | SOMC | RE | $22.32 |
| | ITFX0525RE-SWRI | SWRI | RE | $85.41 |
| | ITFX0525RE-TNVR | TNVR | RE | $204.98 |
| | ITFX0525RE-TOE | TOE | RE | $8,517.29 |
| | ITFX0525RE-VR | VR | RE | $633.35 |
| | ITFX0525RE-VRSO | VRSO | RE | $4,258.08 |
| | ITFX0525RE-WEDG | WEDG | RE | $9,641.37 |
| | ITFX0525RE-YARA | YARA | RE | $2,157.79 |
| **Grand Total** | | | | **$2,179,222.59** |

| | | | |
|---|---|---|---|
| CARB | CARB PD DIRECT | | ($112.73) |
| DIVI | DIVI PD DIRECT | | ($2,138.65) |
| MIDR | MIDR PD DIRECT | | ($2,971.78) |
| BART | BART PD DIRECT | | ($2,313.34) |
| GALK | GALK PD DIRECT | | ($1,743.14) |
| BART | BART PD DIRECT | | ($4,293.13) |
| CRHC | CRHC PD DIRECT | | ($1,394.23) |
| DIVI | DIVI PD DIRECT | | ($1,651.76) |
| FICE | FICE PD DIRECT | | ($1,239.41) |
| IMRY | IMRY PD DIRECT | | ($17,772.62) |
| JBSU | JBSU PD DIRECT | | ($3,263.20) |
| LPAC | LPAC PD DIRECT | | ($198.93) |
| NDPR | NDPR PD DIRECT | | ($382.04) |
| SESM | SESM PD DIRECT | | ($302.81) |
| BYPI | BYPI PD DIRECT | | ($129.86) |
| FICE | FICE PD DIRECT | | ($1,522.26) |
| HELM | HELM PD DIRECT | | ($44,338.31) |
| MWCP | MWCP PD DIRECT | | ($1,855.54) |
| MWSM | MWSM PD DIRECT | | ($11,452.69) |
| POET | POET PD DIRECT | | ($1,746.14) |
| TNVR | TNVR PD DIRECT | | ($204.98) |
| VRSO | VRSO PD DIRECT | | ($4,258.08) |
| WEDG | WEDG PD DIRECT | | ($9,641.37) |
| | **Total Due** | | **2,064,295.59** |

# EXHIBIT 4



|  | | Invoice# | 53820250601 |
|---|---|---|---|
|  | | Date | 06/26/2025 |
|  | | Terms | Net 14 |

ARC Rail 2013-1, LLC          Via Email          Melissa.Cater@gafg.com
201 17th Street NW                                Jonathan.Kantor@gafg.com
Suite 410                                         James.Fall@gafg.com
Atlanta, GA  30363                                andra.matthew@gafg.com
                                                  rail.accountspayable@gafg.com
                                                  fierra.staley@gafg.com

Remit To:   RAS Data Services, Inc.         Bank Name          Chase Bank
            1510 Plainfield Road            Routing Number     071000013
            Suite 3                         Account Number     869730189
            Darien, IL  60561               EIN                54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 99,050.63 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 753 | 1.2681 | 954.87 |

| Invoice Total | 100,005.50 |
|---|---|



| | | |
|---|---|---|
| Invoice# | | 53820250602 |
| Date | | 06/26/2025 |
| Terms | | Net 14 |

ARC Rail Canada Four ULC (2019-1)  Via Email   Melissa.Cater@gafg.com
201 17th Street NW                           Jonathan.Kantor@gafg.com
Suite 410                                         James.Fall@gafg.com
Atlanta, GA  30363                          andra.matthew@gafg.com
                                          rail.accountspayable@gafg.com
                                               fierra.staley@gafg.com

Remit To:    RAS Data Services, Inc.          Bank Name           Chase Bank
             1510 Plainfield Road             Routing Number      071000013
             Suite 3                          Account Number      869730189
             Darien, IL  60561               EIN                 54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 1,454,006.45 |
| | | | | |
| Taxes: | | | | |
| GST | 5/2025 | | | 7,602.56 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| | | | | |
| Fees: | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| | | | | |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| | | | | |
| Management Fees | 5/2025 | 757 | 1.2681 | 959.94 |

| Invoice Total | 1,462,568.95 |
|---|---|



| | | Invoice# | 53820250603 |
|---|---|---|---|
| | | Date | 06/26/2025 |
| | | Terms | Net 14 |

ARC Rail Canada Sub One ULC (2020-1)     Via Email     Melissa.Cater@gafg.com
201 17th Street NW                                                   Jonathan.Kantor@gafg.com
Suite 410                                                                      James.Fall@gafg.com
Atlanta, GA  30363                                                   andra.matthew@gafg.com
                                                                       rail.accountspayable@gafg.com
                                                                              fierra.staley@gafg.com

| Remit To: | RAS Data Services, Inc. | Bank Name | Chase Bank |
|---|---|---|---|
| | 1510 Plainfield Road | Routing Number | 071000013 |
| | Suite 3 | Account Number | 869730189 |
| | Darien, IL  60561 | EIN | 54-2164032 |

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 33,943.46 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 456 | 1.2681 | 578.25 |
| **Invoice Total** | | | | **34,521.71** |



| | | | | | |
|---|---|---|---|---|---|
| | | Invoice# | | 53820250604 | |
| | | Date | | 06/26/2025 | |
| | | Terms | | Net 14 | |

ARC Rail Canada Three ULC (2022)      Via Email      Melissa.Cater@gafg.com
201 17th Street NW                                        Jonathan.Kantor@gafg.com
Suite 410                                                        James.Fall@gafg.com
Atlanta, GA  30363                                          andra.matthew@gafg.com
                                                                    rail.accountspayable@gafg.com
                                                                    fierra.staley@gafg.com

Remit To:    RAS Data Services, Inc.              Bank Name            Chase Bank
             1510 Plainfield Road                 Routing Number       071000013
             Suite 3                              Account Number       869730189
             Darien, IL  60561                    EIN                  54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 36,007.89 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 125 | 1.2681 | 158.51 |
| **Invoice Total** | | | | **36,166.40** |



| | | | | |
|---|---|---|---|---|
| Invoice# | | | | 53820250605 |
| Date | | | | 06/26/2025 |
| Terms | | | | Net 14 |

Infinity Transportation 2016-1, LLC    Via Email    Melissa.Cater@gafg.com
201 17th Street NW                                        Jonathan.Kantor@gafg.com
Suite 410                                                          James.Fall@gafg.com
Atlanta, GA  30363                                         andra.matthew@gafg.com
                                                                     rail.accountspayable@gafg.com
                                                                     fierra.staley@gafg.com

Remit To:      RAS Data Services, Inc.              Bank Name              Chase Bank
                   1510 Plainfield Road                   Routing Number      071000013
                   Suite 3                                       Account Number    869730189
                   Darien, IL  60561                       EIN                          54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 938,844.29 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 4,252 | 1.2681 | 5,391.90 |

| Invoice Total | 944,236.19 |
|---|---|



| | | Invoice# | 53820250606 |
|---|---|---|---|
| | | Date | 06/26/2025 |
| | | Terms | Net 14 |

Infinity Transportation 2018-1, LLC     Via Email

Infinity Transportation 2018-1, LLC
201 17th Street NW
Suite 410
Atlanta, GA  30363

Melissa.Cater@gafg.com
Jonathan.Kantor@gafg.com
James.Fall@gafg.com
andra.matthew@gafg.com
rail.accountspayable@gafg.com
fierra.staley@gafg.com

Remit To:    RAS Data Services, Inc.
1510 Plainfield Road
Suite 3
Darien, IL  60561

| Bank Name | Chase Bank |
|---|---|
| Routing Number | 071000013 |
| Account Number | 869730189 |
| EIN | 54-2164032 |

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 242,927.28 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 24.08 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 2,106 | 1.2681 | 2,670.59 |

| Invoice Total | 245,621.95 |
|---|---|



| | | | | |
|---|---|---|---|---|
| Invoice# | | | | 53820250607 |
| Date | | | | 06/26/2025 |
| Terms | | | | Net 14 |

Infinity Transportation 2019-1, LLC     Via Email     Melissa.Cater@gafg.com
201 17th Street NW                                      Jonathan.Kantor@gafg.com
Suite 410                                                          James.Fall@gafg.com
Atlanta, GA  30363                                       andra.matthew@gafg.com
                                                                   rail.accountspayable@gafg.com
                                                                       fierra.staley@gafg.com

Remit To:     RAS Data Services, Inc.               Bank Name              Chase Bank
                   1510 Plainfield Road                  Routing Number        071000013
                   Suite 3                                      Account Number      869730189
                   Darien, IL  60561                       EIN                         54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 502,861.38 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 2,079.44 |
| HST | 5/2025 | | | 3,422.05 |
| QST | 5/2025 | | | 667.73 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 4,066 | 1.2681 | 5,156.03 |

| Invoice Total | 514,186.63 |
|---|---|



|  |  | Invoice# | 53820250608 |
|---|---|---|---|
|  |  | Date | 06/26/2025 |
|  |  | Terms | Net 14 |

Infinity Transportation 2020-1, LLC     Via Email     Melissa.Cater@gafg.com
201 17th Street NW                                    Jonathan.Kantor@gafg.com
Suite 410                                                        James.Fall@gafg.com
Atlanta, GA  30363                                   andra.matthew@gafg.com
                                                          rail.accountspayable@gafg.com
                                                               fierra.staley@gafg.com

Remit To:     RAS Data Services, Inc.          Bank Name          Chase Bank
                     1510 Plainfield Road               Routing Number    071000013
                     Suite 3                                      Account Number   869730189
                     Darien, IL  60561                    EIN                    54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 |  |  | 1,087,194.15 |
| Taxes: GST | 5/2025 |  |  | 109.40 |
| HST | 5/2025 |  |  | 766.69 |
| QST | 5/2025 |  |  | 0.00 |
| Fees: EHMS | 5/2025 |  |  | 0.00 |
| Umler | 5/2025 |  |  | 0.00 |
| Early Warning | 5/2025 |  |  | 0.00 |
| AAR Tech User | 5/2025 |  |  | 0.00 |
| DDCT | 5/2025 |  |  | 0.00 |
| CRBX Data | 5/2025 |  |  | 0.00 |
| CHDX Data | 5/2025 |  |  | 0.00 |
| ORER | 5/2025 |  |  | 0.00 |
| Ad Valorem Taxes | 5/2025 |  |  | 0.00 |
| Management Fees | 5/2025 | 8,835 | 1.2681 | 11,203.53 |

| Invoice Total | 1,099,273.77 |
|---|---|



| | | Invoice# | | 53820250609 |
|---|---|---|---|---|
| | | Date | | 06/26/2025 |
| | | Terms | | Net 14 |

Infinity Transportation 2022, LLC        Via Email        Melissa.Cater@gafg.com
201 17th Street NW                                          Jonathan.Kantor@gafg.com
Suite 410                                                        James.Fall@gafg.com
Atlanta, GA  30363                                          andra.matthew@gafg.com
                                                              rail.accountspayable@gafg.com
                                                              fierra.staley@gafg.com

Remit To:        RAS Data Services, Inc.              Bank Name              Chase Bank
                 1510 Plainfield Road                Routing Number         071000013
                 Suite 3                             Account Number         869730189
                 Darien, IL  60561                   EIN                    54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 214,923.83 |
| Taxes: | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| Fees: | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 1,624 | 1.2681 | 2,059.37 |

| Invoice Total | 216,983.20 |
|---|---|



| | | | | | |
|---|---|---|---|---|---|
| | | Invoice# | | | 53820250610 |
| | | Date | | | 06/26/2025 |
| | | Terms | | | Net 14 |

Infinity Transportation 2023, LLC        Via Email        Melissa.Cater@gafg.com
201 17th Street NW                                                Jonathan.Kantor@gafg.com
Suite 410                                                                  James.Fall@gafg.com
Atlanta, GA  30363                                                   andra.matthew@gafg.com
                                                                              rail.accountspayable@gafg.com
                                                                              fierra.staley@gafg.com

Remit To:    RAS Data Services, Inc.                  Bank Name            Chase Bank
                   1510 Plainfield Road                     Routing Number     071000013
                   Suite 3                                        Account Number   869730189
                   Darien, IL  60561                        EIN                      54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 317,840.62 |
| | | | | |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| | | | | |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| | | | | |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| | | | | |
| Management Fees | 5/2025 | 1,581 | 1.2681 | 2,004.84 |

| Invoice Total | 319,845.46 |
|---|---|



| | | Invoice# | | 53820250611 |
|---|---|---|---|---|
| | | Date | | 06/26/2025 |
| | | Terms | | Net 14 |

Infinity Transportation 2024, LLC     Via Email     Melissa.Cater@gafg.com
201 17th Street NW                              Jonathan.Kantor@gafg.com
Suite 410                                     James.Fall@gafg.com
Atlanta, GA  30363                       andra.matthew@gafg.com
                                         rail.accountspayable@gafg.com
                                         fierra.staley@gafg.com

| Remit To: | RAS Data Services, Inc. | | Bank Name | Chase Bank |
|---|---|---|---|---|
| | 1510 Plainfield Road | | Routing Number | 071000013 |
| | Suite 3 | | Account Number | 869730189 |
| | Darien, IL  60561 | | EIN | 54-2164032 |

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 83,569.92 |
| | | | | |
| **Taxes:** GST | 5/2025 | | | 44.22 |
| HST | 5/2025 | | | 40.07 |
| QST | 5/2025 | | | 88.21 |
| | | | | |
| **Fees:** EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| | | | | |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| | | | | |
| Management Fees | 5/2025 | 1,152 | 1.2681 | 1,460.83 |
| | | | | |
| **Invoice Total** | | | | **85,203.25** |



| | | Invoice# | 53820250612 |
|---|---|---|---|
| | | Date | 06/26/2025 |
| | | Terms | Net 14 |

Infinity Transportation III, LLC (GA)   Via Email   Melissa.Cater@gafg.com
201 17th Street NW                                    Jonathan.Kantor@gafg.com
Suite 410                                                       James.Fall@gafg.com
Atlanta, GA  30363                                    andra.matthew@gafg.com
                                                          rail.accountspayable@gafg.com
                                                              fierra.staley@gafg.com

Remit To:   RAS Data Services, Inc.        Bank Name          Chase Bank
            1510 Plainfield Road          Routing Number     071000013
            Suite 3                        Account Number     869730189
            Darien, IL  60561             EIN                54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 312,266.40 |
| Taxes: | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| Fees: | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 327 | 1.2681 | 414.66 |

| Invoice Total | 312,681.06 |
|---|---|



| | | | | |
|---|---|---|---|---|
| Invoice# | | | | 53820250613 |
| Date | | | | 06/26/2025 |
| Terms | | | | Net 14 |

Infinity Rail Canada Portfolio 6, ULC    Via Email    Melissa.Cater@gafg.com
201 17th Street NW                                         Jonathan.Kantor@gafg.com
Suite 410                                                         James.Fall@gafg.com
Atlanta, GA  30363                                          andra.matthew@gafg.com
                                                                      rail.accountspayable@gafg.com
                                                                      fierra.staley@gafg.com

Remit To:    RAS Data Services, Inc.             Bank Name          Chase Bank
                  1510 Plainfield Road               Routing Number   071000013
                  Suite 3                                  Account Number  869730189
                  Darien, IL  60561                    EIN                    54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 5,960.68 |
| Taxes: | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| Fees: | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 146 | 1.2681 | 185.14 |
| **Invoice Total** | | | | **6,145.82** |



| | | Invoice# | 53820250614 |
|---|---|---|---|
| | | Date | 06/26/2025 |
| | | Terms | Net 14 |

Infinity Rail Canada Portfolio 7, ULC     Via Email     Melissa.Cater@gafg.com
201 17th Street NW                                              Jonathan.Kantor@gafg.com
Suite 410                                                              James.Fall@gafg.com
Atlanta, GA  30363                                              andra.matthew@gafg.com
                                                                           rail.accountspayable@gafg.com
                                                                           fierra.staley@gafg.com

Remit To:     RAS Data Services, Inc.          Bank Name              Chase Bank
                    1510 Plainfield Road              Routing Number      071000013
                    Suite 3                                  Account Number    869730189
                    Darien, IL  60561                   EIN                         54-2164032

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 12,425.76 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 162 | 1.2681 | 205.43 |
| **Invoice Total** | | | | **12,631.19** |



| | | | Invoice# | 53820250615 |
|---|---|---|---|---|
| | | | Date | 06/26/2025 |
| | | | Terms | Net 14 |

Infinity Transportation 2019-2, LLC     Via Email     Melissa.Cater@gafg.com
201 17th Street NW                                         Jonathan.Kantor@gafg.com
Suite 410                                                         James.Fall@gafg.com
Atlanta, GA  30363                                         andra.matthew@gafg.com
                                                                     rail.accountspayable@gafg.com
                                                                     fierra.staley@gafg.com

| Remit To: | RAS Data Services, Inc. | | Bank Name | Chase Bank |
|---|---|---|---|---|
| | 1510 Plainfield Road | | Routing Number | 071000013 |
| | Suite 3 | | Account Number | 869730189 |
| | Darien, IL  60561 | | EIN | 54-2164032 |

| Item | Account | Cars | Rate | Amount |
|---|---|---|---|---|
| Maintenance Invoices Paid | 5/2025 | | | 0.00 |
| **Taxes:** | | | | |
| GST | 5/2025 | | | 0.00 |
| HST | 5/2025 | | | 0.00 |
| QST | 5/2025 | | | 0.00 |
| **Fees:** | | | | |
| EHMS | 5/2025 | | | 0.00 |
| Umler | 5/2025 | | | 0.00 |
| Early Warning | 5/2025 | | | 0.00 |
| AAR Tech User | 5/2025 | | | 0.00 |
| DDCT | 5/2025 | | | 0.00 |
| CRBX Data | 5/2025 | | | 0.00 |
| CHDX Data | 5/2025 | | | 0.00 |
| ORER | 5/2025 | | | 0.00 |
| Ad Valorem Taxes | 5/2025 | | | 0.00 |
| Management Fees | 5/2025 | 0 | 1.2681 | 0.00 |

| Invoice Total | 0.00 |
|---|---|