**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RAS DATA SERVICES, INC., | ) | Case No. 25 B 11837 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| INFINITY TRANSPORTATION 2024, LLC., et al., | ) | |
| | ) | |
| Plaintiffs and Counter-Defendants, | ) | Adversary No. 25 A 00244 |
| | ) | |
| v. | ) | |
| | ) | Hon. Michael B. Slade |
| RAS DATA SERVICES, INC., and OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants and Counter-Plaintiffs. | ) | |
| | ) | |
| ———————————————— | ) | |

**MEMORANDUM OPINION DENYING THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS'S MOTION FOR JUDGMENT ON THE PLEADINGS**

The question posed in this Adversary Proceeding is whether payments made pre-petition

to debtor RAS Data Services, Inc. ("RAS") under the parties' management service agreements

("MSAs") are property of the estate under 11 U.S.C. § 541.  The plaintiffs, led by Infinity

Transportation 2024, LLC ("Plaintiffs"), contend they are not, arguing that RAS was acting only

as the Plaintiffs' agent when it took possession of the funds.  Based on what is before me right

now, Plaintiffs are unlikely to succeed, but the standard to survive a motion under Federal Rule

of Civil Procedure 12(c) is very low.  To advance, Plaintiffs' theory must only be supported by

enough pled facts to be plausible.  For that reason only, the motion for judgment on the pleadings

filed by the Official Committee of Unsecured Creditors (the "Committee") is denied.

I.

RAS is a key player in the long-haul railroad freight transport business. It contracts with owners of freight railcars who need to ensure that their property (hundreds of railcars that move on or adjacent to rail across the U.S.) is maintained and serviced properly. Under MSAs with its customers, RAS ensures that each railcar is properly serviced (by the railroad, a third party vendor, or both), efficiently, at a fair and appropriate price. RAS's value-add is its expertise in making sure the process of owning and servicing railcars that constantly cross the nation is efficient and cost-effective and in making it easier for both railroads and railcar owners to operate profitably. That's why RAS was formed and why RAS's business will continue post-bankruptcy.

RAS filed for bankruptcy on August 1, 2025. (Bankr. Case No. 25-11837, Dkt. No. 1) RAS sought chapter 11 protection for a simple and straightforward reason: it was robbed. Michael Calomino, RAS's founder, largest shareholder, and CEO, had "built the Debtor into a business that appears to have been, and essentially remains, profitable, on a cash basis of accounting and without extraordinary expenses." (*Id.*, Dkt. No. 6, Decl. of Sandor Jacobson ¶ 8) But Calomino allegedly looted his company to fund a "severe gambling addiction." (*Id.* ¶ 9) He did that by removing money that was in the RAS coffers on the so-called "float." RAS often collected funds from its customers in anticipation of services to be arranged, but didn't remit payment to the vendors providing those services for a month or more thereafter. (*Id.* ¶ 28) Calomino could raid the "parked" funds, knowing that new customer payments would come in to cover the services that needed to be paid. That's why RAS's "cash flow was sufficient to allow [Calomino's] conduct to go unnoticed for years." (*Id.* ¶ 9)

But the chickens eventually came home to roost.  Calomino confessed and resigned, and independent leadership filed this Chapter 11 case as the best path forward for creditors, particularly "considering the alternative:  a liquidation in which a productive economic enterprise is shuttered, the rail transport industry suffers major disruption, 31 individuals lose their jobs, and Owners and other creditors receive a fraction of their claims."  (*Id.* ¶ 12)  However, Calomino's theft left a mess to sort out:  because he raided funds meant to satisfy RAS's accounts payable (and not just the profits RAS made on its management fees), the payments owed to customers and third-party service providers now far exceed the Debtor's cash on hand.  (*Id.* ¶¶ 29, 32)  If certain parties can show a superior right to the cash in the Debtor's accounts, they will be able to jump the line and avoid having to split the remains—unless, of course, enough other parties can establish that same "superior" right.

II.

Plaintiffs own and lease approximately 47,000 railcars throughout North America.  (Adv. No. 25-00244, Bankr. N.D. Ill., Dkt. No. 1, Compl. ¶ 13)  As with all of RAS's other customers, they contract with RAS for "mechanical, regulatory, accounting and consulting services," (Compl., Ex. 1 § 1), which include mileage collection and accounting, receipt and reconciliation of repair data, car repair billing processing and auditing, post-petition audit and processing and exceptions, lease information management and rebilling, management of bad order and railroad damaged equipment, "umler" management, ad valorem tax filing, management reporting, and technical reporting.  (*Id.* § 4).

The parties' obligations to each other are described in the MSA, which is attached to, and thus is a part of, the Complaint.  *See* Fed. R. Civ. P. 10(c) & Fed. R. Bankr. P. 7010.  According to the Complaint, RAS is "not a repair shop and performs no actual repair services" for Plaintiffs,

3

but does perform "other important services" for them.  (Compl. ¶ 15)  RAS collects funds billed

to railcar lessees for repair costs allocated to them under leases with Plaintiffs.  (*Id.*)  It also pays

third party vendors who "actually perform railcar repair services" on cars Plaintiffs own; the

Plaintiffs advance payments to RAS in a way that Plaintiffs allege is "earmarked for payment to

the specific vendors."  (*Id.* ¶¶ 16, 21)  Finally, RAS collects from railroads and pays to Plaintiffs

certain "usage fees" arising from railroads' use of Plaintiffs' railcars.  (*Id.* ¶ 17)  For its services,

RAS receives a monthly management fee and an additional fee depending on how many railcars

were affected by RAS's services.  (*Id.* ¶ 24)

RAS had similar arrangements with all of its customers.[1]  However, RAS advises that,

when "commencing its business relationship" with CIT Rail (its largest customer, not a plaintiff

here), CIT "negotiated for segregation of its payments to [RAS] into a designated account of

[RAS]."[2]  Thus, RAS created a separate bank account for its relationship with CIT, which it used

"only for matters involving CIT."[3]  Plaintiffs do not allege that RAS created a separate bank

account specifically for their business dealings.[4]

RAS took in significant funds as part of its business with the Plaintiffs.  In June 2025,

Plaintiffs paid RAS about $2 million.  (Compl. ¶ 25)  RAS also collected about $225,000 in so-

---

[1]  RAS advises that the MSA between it and Plaintiffs is generally the same as the agreements with all customers other than CIT.  *See* Dkt. No. 23 ¶ 18 ("The MSAs generally contain (and omit) the same material terms, save for the Debtor's single largest customer [CIT] . . . .").

[2]  Dkt. No. 23, *Motion of the Debtor for Entry of an Order Authorizing Post-Petition Operating Procedures Outside the Ordinary Course of Business and Shortening Notice Thereof*, ¶ 18.

[3]  Dkt. No. 15, *Motion of the Debtor for Entry of an Order Authorizing: (A) Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Cash Management System, (C) Continued Use of Existing Business Forms, and (D) Continued Use of Existing Books and Records*, ¶ 24.

[4]  *See also* Dkt. No. 6, ¶ 57 and Dkt No. 15, *inter alia* (explaining that RAS maintains four accounts: (1) the CIT account, (2) a savings account into which cash receipts were deposited, and (3) two checking accounts with different distribution purposes; RAS would transfer money from the savings account to the checking accounts, and pay third-party vendors for customer activities from one and pay expenses related to RAS's own administrative and overhead costs from the other).

4

called "Car Hire Fees" from railroads, which it should have paid to Plaintiffs. (*Id.* ¶ 27) Railcar lessee Canpotex paid RAS another $1.1 million in July, which RAS "failed to remit" back to Plaintiffs. (*Id.* ¶ 25) And most significantly, the Complaint alleges that on June 26, 2025, RAS sent data to Plaintiffs to support a request for a vendor advance of $5.3 million and Plaintiffs paid it "earmarked for direct payment by [RAS] to repair vendors who performed work" on Plaintiffs' railcars. (*Id.* ¶¶ 28–29, 33; *see also id.* Exs. 4–5) These dollars received either (a) were transferred out of RAS's cash management system to satisfy accounts payable or (b) constitute a portion of the approximately $20 million that existed in RAS's bank accounts on the date the bankruptcy was filed. (*Cf.* Dkt. No. 6 ¶ 32) Plaintiffs want back any money in RAS's centralized account that wasn't used to pay for services on their railcars.

Plaintiffs must have been prepared for RAS's bankruptcy because, within minutes of the petition's filing (even before RAS completed filing its first day motions), they initiated this Adversary Proceeding. (*See* Case No. 25-11837, Bankr. N.D. Ill., Dkt. No. 7) Three days later, once the first-day hearing was scheduled in the bankruptcy, Plaintiffs filed an emergency motion seeking a preliminary injunction. (*See* Adv. No. 25-244, Bankr. N.D. Ill., Dkt. No. 6)

Plaintiffs' theory for relief is that none of the funds RAS collected as part of its work for them (other than RAS' management fees) are property of the estate because "[a]t all relevant times the Debtor served as an agent for [Plaintiffs] with respect to the billing and collection services summarized herein." (Compl. ¶ 14) Plaintiffs' Complaint alleges, repeatedly, the conclusion that RAS "serves solely as an agent" for each of the Plaintiffs. (*Id.* ¶ 38; *see also id.* ¶¶ 1, 11, 14, 26) Plaintiffs claim that RAS "holds no legal or equitable interest" in any funds it holds other than the small sum of management fees collected and not yet spent. (*Id.* ¶¶ 39–41) Although cash is fungible, Plaintiffs assert that the funds held by RAS in which they claim legal

5

and equitable title "are identifiable and traceable." (*Id.* ¶ 46)  So they seek "a declaration that the funds held by [RAS] as agent for the Infinity Lessors are not property of the estate" and ask me to impose "a constructive trust to prevent [RAS] from using the Infinity Lessors' property to fund this Chapter 11 bankruptcy case." (*Id.* ¶¶ 2, 37–57)  They also seek an accounting of all funds collected by RAS on their behalf and all subsequent transfers out of the accounts into which such funds were deposited.  (*Id.* ¶¶ 51–55)[5]

RAS answered Plaintiffs' complaint (Dkt. No. 37) as did the Official Committee of Unsecured Creditors (the "Committee") (Dkt. No. 53), which had intervened as a defendant (Dkt. No. 48).  The Committee now asks me to grant it judgment on the pleadings, asserting that "[b]ecause the pleadings clearly establish that [RAS] was not the Plaintiffs' agent, each of [the claims in] the Counts must fail a matter of law." (Dkt. No. 55 ¶ 10)  In other words, the Committee contends that the allegations of the complaint (and its attachments) establish that I *cannot* declare that any of the contractual payments belong to Plaintiffs as a matter of law.  Now that the parties have attempted mediation and failed (so far) to reach a resolution, I will rule.

III.

Federal Rule of Civil Procedure 12(c), applicable here via Federal Rule of Bankruptcy Procedure 7012(b), permits parties to seek judgment as a matter of law after the pleadings are closed.  "When a defendant files a Rule 12(c) motion to challenge the sufficiency of the complaint, . . . the motion performs the same function as a Rule 12(b)(6) motion to dismiss— and the complaint must meet the Rule 12(b)(6) standard for the suit to survive." *Wolf v. Riverpoint Ins. Co.*, 132 F.4th 515, 518 (7th Cir. 2025).  "The only difference between a motion

---

[5]  There is a typo in the paragraph numbering in the complaint; the first Paragraphs 51–57 appear on page 12 (belonging to Count II) and the second Paragraphs 51–57 appear on pages 13–14 (belonging to Count III).

for judgment on the pleadings and a motion to dismiss is timing; the standard is the same."

*Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020).

The Supreme Court's adoption of the plausibility standard and abandonment of the "beyond doubt" and "no set of facts" standard for Rule 12(b)(6) dismissal motion applies to Rule 12(c) motions. *Wolf*, 132 F.3d at 519. Under the applicable standard, a claim as pled must only be plausible, raising a plaintiff's right to relief above a "speculative level," and the grounds for relief must be "more than labels and conclusions" to "nudge the[] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

As I have stated before, the pleadings bar that Plaintiffs must clear here is relatively low. *Goldstein v. Graft (In re Graft)*, Case No. 22 B 02921, Adv. No. 24-0069, 2025 WL 45085, at *3 (Bankr. N.D. Ill. Jan. 7, 2025). Details of a claim are not required at the pleading stage and I am required to both accept all factual assertions as true *and* make all reasonable inferences in Plaintiffs' favor. "It is enough to plead a plausible claim, after which 'a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.'" *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) (quoting *Chapman v. Yellow Cab Cooperative*, 875 F.3d 846, 848 (7th Cir. 2017) (internal quotation marks omitted)). A "full description of the facts that will prove the plaintiff's claim comes later, at the summary judgment stage or in the pretrial order." *Id.*

The lack of need for detail at the Rule 12 stage is dispositive here. Too many motions to dismiss are filed suggesting, incorrectly, that more is required. A complaint must only contain "enough details about the subject-matter of the case to present a story that holds together." *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018). That's all. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

the claims." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).  I can dismiss only if

Plaintiff's claims are implausible, even where I have real doubts about Plaintiffs' ability to

ultimately prevail.

Here, the Committee is essentially arguing that, in addition to not stating a plausible

claim for a declaration that the contractual payments do not belong to the estate, the Plaintiffs'

allegations (along with the MSA attached to the Complaint) instead establish that they are not

entitled to that declaration as a matter of law.  *See O'Gorman v. City of Chi.*, 777 F.3d 885, 889

(7th Cir. 2015) (instructing that "[a] complainant can plead himself out of court by including

factual allegations that establish that the plaintiff is not entitled to relief as a matter of law"); *see*

*also Raridon v. Carlson (In re Carlson)*, 545 B.R. 229, 231 (Bankr. N.D. Ill. 2016).  While right

now I lean heavily in the Committee's direction based on my understanding of the MSA and its

parties' relationship, I cannot consistent with the applicable standard grant its Rule 12(c) motion.

IV.

Count I seeks a declaratory judgment that the specified funds received by RAS are not

property of the estate.  To advance, the Plaintiffs must allege facts which, if true, show it's

plausible that the funds fall outside the scope of section 541 of the Bankruptcy Code—the

applicable law that defines what is, and is not, property of a debtor's estate.  Strangely, none of

the briefing addresses section 541 or cites the key Seventh Circuit cases on point, so I will.

Under 11 U.S.C. § 541(a)(1), except as specifically provided, "all legal interests of the

debtor in property as of the commencement of the case" are property of the estate.  Congress

used the word "all" in Section 541(a)(1) and enumerated a few specified exceptions in Section

541(b) and (c)(2) to make clear that except as explicitly provided, "every conceivable interest of

the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of §

8

541." *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993); *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) ("Congress intended a broad range of property to be included in the estate"); *In re Geise*, 992 F.2d 651, 655 (7th Cir. 1993) ("The scope of section 541 is broad").

The only exception potentially applicable here is Section 541(d), which provides that:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).  Under this section, if "the debtor holds legal, but not equitable, title to property, it is excluded from the estate pursuant to § 541(d)." *Ryan v. Branko Prpa MD, LLC*, 55 F.4th 1108, 1112 (7th Cir. 2022); *see also Grede v. FCStone, LLC*, 867 F.3d 767, 783 (7th Cir. 2017) ("Only property of the estate could and should be distributed pro rata to creditors. Property belonging to others must be returned to them."); *Marrs-Winn Co. v. Giberson Elec., Inc. (In re Marrs-Winn Co.)*, 103 F.3d 584, 589 (7th Cir. 1996) (property is outside the estate when "the debtor acquires only bare legal title to the trust proceeds and maintains no equitable interest in those proceeds").

The Seventh Circuit cases applying Section 541(d) help identify the sort of relationship that would exclude property in the Debtor's possession from Section 541(a)'s broad purview.

*Ryan* is the most recent.  The debtor there had settled a workers' compensation claim in an agreement (and ALJ Order approving it) providing that payments would go to his counsel for distribution partially to him and partially to medical providers and lienholders.  55 F. 4th at 1113.  Ryan then filed for bankruptcy and argued that the whole settlement payment in his lawyer's possession was part of his estate.  Applying Wisconsin law, the bankruptcy court (and Seventh Circuit) disagreed.  "The text of the Settlement and the Order approving it established an express

9

trust in favor of medical creditors." *Id.* at 1114. And under Section 541, "property of the estate includes the debtor's claims to property—not the property itself." *Id.* at 1117. Thus, the debtor only had an interest in the portion of the settlement agreement that was *not* expressly paid to his lawyer in trust for distribution to the doctors who treated him; the rest was outside of his bankruptcy estate.

*Grede* is also illustrative. The debtor there, Sentinel Management Group, had accepted investments from futures commission merchants (FCMs) that were "protected by statutory trusts under the Commodity Exchange Act," but it misappropriated or comingled the funds in violation of the statute. 867 F.3d at 771–72. The governing regulatory regime "required Sentinel to hold customer funds in segregation" and "created statutory trusts in the customers' favor to protect their property from Sentinel and its other creditors." *Id.* at 772. As part of a complicated appeal on a variety of issues, the Seventh Circuit reversed a decision by the district court permitting some of those deposits to be distributed among creditors in light of the "unrebutted evidence at trial showing [that one particular investor] can trace a portion of the reserve funds back to its investment," *id.* at 771, and the basic principle that "[u]nder the Bankruptcy Code, property held by the debtor in trust for others is by definition not property of the bankruptcy estate," *id.* at 771, *see also id.* at 775–79 (describing the issue in far more detail).

Finally, consider *Marrs-Winn*. The debtor was a subcontractor responsible for installing steel on a football stadium being built in St. Louis. Following the debtor's bankruptcy filing, it opened a bank account for the purposes of accepting deposits from the general contractor, and the loan agreement prohibited any withdrawals other than those with the written consent of the debtor and ultimate guarantor. *In re Marrs-Winn Co., Inc.*, 193 B.R. 491, 494–95 (C.D. Ill. 1996) *aff'd*, 103 F.3d 584 (7th Cir. 1996). The guarantor unilaterally (and in violation of the

10

account agreement) removed funds from the account, and the general contractor and debtor demanded their return, claiming breach of contract and violation of the automatic stay. *Id.* Applying Missouri law, the district court (and Seventh Circuit) agreed with the bankruptcy court that the money in the account was "Held Pursuant to an Express Trust" and had to be returned thereto. *Id.* at 496 ("funds held by subcontractors that are intended to be paid to materialmen and other laborers are not subject to the claims of other creditors"). The key to the conclusion in *Marrs-Winn* was the language of the parties' contract, which "clearly expresses both the intent to establish a trust and the terms of the trust." *Id.* at 497. "As trust funds, the funds in the [] account came to the bankruptcy estate subject to the claims of the beneficiaries." *Id.* at 498; *see also Marrs-Winn*, 103 F.3d at 595 (holding that the guarantor "could not divest the beneficiaries of their equitable interest in the trust funds by surreptitiously transferring the monies to its own private account").[6]

The common link among the Seventh Circuit cases finding property outside the estate is the clarity of the trust into which the property had been deposited. In *Ryan* and *Marrs-Winn* the clarity was provided by a highly-detailed contract; in *Grede* it was cemented by statute. The question here is whether a similar relationship was created by the parties' MSAs and conduct.

---

[6]   Plaintiffs seem to allege that the debtor is akin to a general contractor responsible for a project who filed for bankruptcy after it had received funds from the owner but before the debtor/general contractor had paid the subcontractors who had performed work. In those cases, Illinois courts have found a trust relationship—but it is one created by the state mechanics' lien statute. *See, e.g.*, *Raymond Prof. Group., Inc. et al. v. William A. Pope Co. et al. (In re Raymond Prof. Group., Inc.)*, 408 B.R. 711, 726–27, 728 (Bankr. N.D. Ill. 2009) (finding trust created under state statute); *Stair One, Inc. v. Hivon (In re Hivon),* No. 14 A 710, 2015 WL 687124, at *5 & n.2 (Bankr. N.D. Ill, 2015) (describing state statute creating trust relationship under Illinois law); *Anchor Mech. Inc. v. Steege (In re ICM, Inc.)*, 502 B.R. 220, 223–27 & n.2 (Bankr. N.D. Ill. 2013) (finding trust not created, and distinguishing *Raymond Prof. Group*, because subcontractor had not strictly complied with the state statute that would have provided it protection) ("A payment received by a contractor like ICM is subject to a trust in favor of a subcontractor like Anchor [only] if two conditions are met."). That Illinois state statute is specific to real property improvement scenarios and does not apply here, which may present real issues for Plaintiffs when this matter is properly teed up for resolution.

11

The distinction between *Marrs-Winn* and another Seventh Circuit case, *Chicago Cutter-Karcher, Inc. v. Maley (In re Lord's Inc.)*, 356 F.2d 456 (7th Cir. 1965), is instructive.  The debtor in *Lord's* was a department store who had leased space to a shoe and accessory distributor (Chicago Cutter) under a contract that split the money received when the debtor sold the relevant shoes at its store.  The contract permitted the debtor to hold monies received on account of relevant shoe sales in the debtor's general bank account, although it also provided that such funds would be held in trust for Chicago Cutter.  *Id.* at 457 (agreement said that funds, even if commingled in the debtor's bank account, "are considered trust funds, and are to be so held by Lessor in trust").  But the bankruptcy referee found that "the lease agreement and the conduct of the parties showed a relationship of debtor and creditor and not the creation of a trust."  *Id.*  And the Seventh Circuit majority agreed, finding that because all of the debtor's receipts were commingled (and the parties' contract permitted commingling), "we have before us a set of circumstances similar to those in which courts have refused to imply a trust."  *Id.* at 458.  The "question" at issue in *Lord's* was "whether the settlor manifested an intention to create the kind of relationship which to lawyers is known as a trust, whether the settlor manifested an intention to impose upon himself or upon a transferee of the property equitable duties to deal with the property for the benefit of another person."  *Id.*  The answer, per the Seventh Circuit, was no, and the failure to create a separate account for the lessee's funds was highly relevant, demonstrating that "a 'trust' clause had been inserted into a document which otherwise sets up a simple debtor-creditor relationship."  *Id.* at 459; *see also Marrs-Winn*, 193 B.R. at 497 (explaining that, in *Lord's*, "[b]ased on the contradictory terms of the agreement, which purported to impose a trust yet permitted commingling, and the conduct of the parties, the Seventh Circuit concluded that no trust existed").

V.

The parties' briefs neither cite nor attempt to apply or distinguish any of these highly relevant cases.  Instead both sides focus on the general concept of "agency" as it applies in other areas of law.  And the parties are right that proving the debtor served solely as a creditor's agent can be, in some cases, a way to establish that the debtor does not have an equitable interest in property it took possession of in its agent capacity.

The nature and extent of the debtor's interest in property is determined by "the substantive law of the forum state."  *Almar Commc'ns, Ltd. v Telesphere Commc'ns, Inc. (In re Telesphere Commc'ns, Inc.)*, 205 B.R. 535, 541 (N.D. Ill. 1997) (citing *Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992)).  And "[u]nder Illinois law, an agent does not own property transferred to it by or for the benefit of the principal."  *Greenfield Direct Response, Inc. v. ADCO List Mgmt. (In re Greenfield Direct Response, Inc.)*, 171 B.R. 848, 857 (Bankr. N.D. Ill. 1994) (citing cases); *Telesphere*, 205 B.R. at 542 ("In Illinois, even though possession of personal property raises a *prima facie* presumption of ownership, that presumption is overcome if the person or entity's possession was not as owner of the property, but as an agent for the owner. . . . In this regard, agents generally do not own personal property transferred into their possession by or for the benefit of a principal." (citing *Adams v. Adams*, 54 N.E. 958, 959 (Ill. 1899)); *In re Farbman*, 244 B.R. 135, 140–41 (Bankr. N.D. Ill. 2000) ("An agent who collects money on behalf of the principal does not become the owner of such money." (citing *Kearney v. Webb*, 115 N.E. 844, 845–46 (Ill. 1917))); *Maxwell v Penn Media (In re marchFirst, Inc.)*, Case No. 01-24742, Adv. No. 03-1141, 2010 WL 4027723, at *6 (Bankr. N.D. Ill. Oct. 14, 2010) ("An agent who takes possession of money on behalf of his principal does not become the owner."). Therefore, "[p]roperty held by a debtor as agent does not become property of the estate, as it

13

belongs to someone else, usually the principal." *Greenfield Direct*, 171 B.R. at 857; 5 COLLIER

ON BANKRUPTCY ¶ 541.05[1][a] ("[I]t has been settled under the Code and prior law that absent

state statutory enactment to the contrary, if property is in a debtor's hands as bailee or agent, the

debtor's estate holds only the same interest, and the bailor or principal may recover the property

or its proceeds.").

But an agency relationship is not easily established. "A principal-agent relationship

exists 'when one person (a "principal") manifests assent to another person (an "agent") that the

agent shall act on the principal's behalf and subject to the principal's control, and the agent

manifests assent or otherwise consents so to act.'" *Schutz v. Arrow Fin. Servs., LLC*, 465 F.

Supp. 2d 872, 877 (N.D. Ill. 2006) (quoting Restatement (Third) of Agency § 1.01 (2006))

(noting that "both Illinois courts and the Seventh Circuit follow the Restatement of Agency")).

The clear manifestation by both parties of an intention to enter into a principal-agent relationship

is critical given the implications of the relationship—among other things, a principal can be

bound by the agent's actions and the agent is a fiduciary, with heightened duties, to the principal.

*See Regnery v. Regnery*, 570 N.E.2d 557, 562–63 (Ill. App. 1991) ("It is well-settled in agency

law that the relationship between a principal and agent is one of trust and confidence and that the

agent owes a duty of loyalty to his principal."). Agency is not a common commercial

relationship.

"The usual tests of agency are whether the principal has authority to control the method

or manner of accomplishing a task by the agent, and whether the agent has authority to subject

the principal to liability." *Greenfield Direct*, 171 B.R. at 855 (citing *Wargel v. First Nat'l Bank of

Harrisburg*, 460 N.E.2d 331, 336 (Ill. App. 1984)); *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 588 (7th

Cir. 2021) (explaining that the "right to control" is a "constant" hallmark of an agency

relationship); *Sosa v. Onfido, Inc.*, 8 F. 4th 631, 641 (7th Cir. 2021) (no agency established where there was "no evidence" that principal "exercised control" over alleged agent's activities, or "could affect legal relationships" on the alleged principal's behalf); *Kolchinsky v. Western Dairy Transp., LLC*, 949 F.3d 1010, 1013–14 (7th Cir. 2020) ("The cardinal consideration for determining the existence of an agency relationship is whether the alleged principal has the right to control the manner of work performance." (quotation marks omitted)); *United States v. Bryant*, 750 F.3d 642, 651 (7th Cir. 2014) (an agency relationship cannot be found where there is no evidence the alleged agent consented to be controlled); *Valenti v. Qualex, Inc.*, 970 F.2d 363, 368 (7th Cir. 1992) ("The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal.").  There is no agency relationship, but rather a mere debtor-creditor relationship, where an alleged agent "was entitled to keep the funds that it collected for a specified period of time before remitting them to the principal" because it is "permitted to maintain some control over the funds" it receives on the purported principal's behalf.  *Greenfield Direct*, 171 B.R. at 858 (citing cases).

VI.

Whether parties have created an agency relationship is typically a question of fact. *United States v. Dish Network LLC*, 954 F.3d 970, 975 (7th Cir. 2020).  But "where the agency authority has been conferred in writing and there is no dispute concerning the parties' relationship, the question becomes one of law." *Regnery v. Regnery,* 570 N.E.2d at 561; *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 474 (7th Cir. 1997) ("The existence and scope of an agency relationship are questions of fact to be determined by the trier of fact '[u]nless the parties['] relationship is so clear as to be undisputed.'" (quoting *Mateyka v.*

15

*Schroeder*, 504 N.E.2d 1289, 1294 (Ill. App. 1987))).  As with all contracts, Illinois law requires that if the writing is unambiguous, the parties' intentions should be gleaned from the contract language and extrinsic evidence is inadmissible to shade the interpretation.  *World Ins. Co. v. Smith*, 329 N.E.2d 518, 520 (Ill. App. 1975).

The body of the Complaint does little more than repeatedly allege the conclusion that an agency relationship existed between the Plaintiffs and RAS (Compl. ¶¶ 1, 11, 14–17, 22, 35, 38). Those assertions aren't compelling, but the MSA has several provisions that appear germane to the dispute—some of which are clearer than others.  First, the MSA includes a provision that appears to say that RAS is *not* an employee, partner, or *agent* of any customer, and has no authority to bind any customer to anything:

> ***(13) INDEPENDENT CONTRACTOR***  RAS, and its employees, will serve as an independent contractor hereunder, and not as an employee, partner or agent of any Railcar Owner, and will not by reason of the Agreement, or performance hereunder, have or acquire any rights or claims against any Railcar Owner with respect to medical or other insurance, workmen's compensation, pension or retirement benefits, or other fringe benefits accorded to Infinity employees. RAS shall have no authority to bind or commit any Railcar Owner in any manner whatsoever by reason of the Agreement.

(Compl., Ex. 1 ¶ 13) Plaintiffs are correct, however, that, courts have viewed provisions like this expressly disclaiming an agency relationship as "only part of the total picture painted by the Agreement in real world terms." *Washington v. Kass Mgmt. Servs.*, No. 10-c-4409, 2011 WL 1465581, at *3 (N.D. Ill. Apr. 18, 2011).  While "an express denial of an agency relationship establishes a strong presumption for [Plaintiff] to overcome," a party can overcome that presumption by pointing to the "actual operational relationship as spelled out throughout the Agreement and as carried out by the parties." *Id.*  Thus we turn to the rest of the MSA and to the Complaint's allegations about the parties' conduct and course of dealing.

16

In the MSA paragraph primarily relied on by Plaintiffs, RAS agrees to receive "maintenance billing" directly from railroads that perform work on customers' railcars, and to render payment on account of such billing "on behalf of each Railcar Owner."  The title of that section, describing RAS's obligation to receive bills from railroads and pay them, is "Agent for Receipt of Railroad Billing":

> **(3) AGENT FOR RECEIPT OF RAILROAD BILLING**  RAS and each Railcar Owner (solely for itself and its railcars) will be jointly responsible for updating industry publications such that RAS will receive all maintenance billing directly from repairing railroads. Subsequent to pre-payment audit and approval based on Association of American Railroads rules and Generally Accepted Accounting Principles, RAS will render payment to railroads on behalf of each Railcar Owner. RAS will generate and distribute all necessary billing disputes to appropriate vendors on behalf of each Railcar Owner. At the close of each accounting period, RAS will submit an invoice to each applicable Railcar Owner with sufficient documentation so that the Railcar Owner will reimburse RAS in full for maintenance, management, and related charges on a maximum net fourteen (14) day payment schedule.

(Compl., Ex. 1 § 3)  As the Committee notes, the term "agent" does not appear anywhere in the operative text of Section 3; it's just in the heading.  But as a matter of substance, the provision does require RAS to account "with documentation" for the charges it incurred on Plaintiffs' behalf, and Plaintiffs attach an invoice asking at least one customer to pay RAS as "agent for" Plaintiffs.  *See* Compl. Ex. 2 (asking customer to remit payment to "RAS Data Services, Inc *agent for Infinity Transportation*" (emphasis in original)).  While that's just one invoice, perhaps RAS's form invoice, the parties' course of conduct, or both, will substantiate Plaintiffs' interpretation of MSA § 3.  I am not persuaded yet, but Plaintiffs' interpretation and the inferences they ask me to draw from these facts are plausible, and the Seventh Circuit has cautioned that trial courts "should not allow motions for judgment on the pleadings to deprive the non-moving party of the opportunity to make its case." *Federated Mut.*, 983 F.3d at 313.  So I will give Plaintiffs that opportunity.

I note that further complicating Plaintiffs' theory is most of the rest of the MSA, which appears to obligate RAS to procure the services performed on railcars without much if any input from customers.  It appears that RAS chose the vendors (except when railroads themselves made repairs), chose the services to be performed, assessed if the cost was reasonable, and ensured bills were paid.  The MSA seems to provide that (a) RAS is responsible for those tasks, (b) RAS must indemnify Plaintiffs for any subcontractors' issues, and (c) RAS's duties are not assignable:

> *(2) ADDITIONAL CONTRACTORS*  RAS may, at its discretion, enlist additional software, support, and/or service contractors to fulfill the obligations of the Agreement. RAS assumes all liabilities for cost, performance/nonperformance, and support of services provided by such contractors, which in all respects will be subject to all terms hereof to which RAS is subject, excepting Indurante & Associates, Inc., who will not be subject to the SaaS Terms Addendum and the CyberSecurity Addendum attached hereto and incorporated herein by reference. Each Railcar Owner will not by association with RAS be considered a licensee or remarketer of such services and/or systems, responsible to pay their fee, cost and expenses or liable in any way for their performance.

> *(12) INDEMNIFICATION*  RAS shall be responsible to each Railcar Owner for all work performed by RAS and RAS's subcontractors.  RAS shall indemnify and hold each Railcar Owner, and their servicer(s), harmless from all liability, damage, cost or expense, including, without limitation, expenses in prosecuting or defending any claim or suit such as attorney's fees, court costs and other expenses arising out of (i) any failure of RAS or its subcontactors to comply with its obligations under this Agreement; (ii) any claim, whether private or governmental, for personal injury or death, or for loss of or damage to person, property or cargo arising out of or incident to the Services or caused by the negligence or intentional misconduct of RAS or its subcontractors.  Each party undertakes promptly to give notice to the other of claims against it or action against it with respect thereto, and RAS agrees not to settle any action without the consent of the applicable Railcar Owner(s), such consent not to be unreasonably withheld or delayed. . . .

> *(14) ASSIGNMENT*  RAS shall not assign any of its rights or obligations herein without the prior written consent of all of the Railcar Owners.  Any Railcar Owner may assign its rights and obligations herein (a) to an affiliate without RAS's prior consent and shall give notice of such assignment to RAS within ten (10) business days after such assignment (provided, however, that later notice is acceptable if RAS has not suffered any material harm from the delay[]); and (b) to a non-affiliate with RAS's prior consent not to be unreasonably withheld, conditioned, or delayed.

(Compl., Ex. 1 §§ 2, 12, 14)  The only contractual direction given to RAS is that it is to "perform

and/or provide" services to customers "based on applicable AAR Rules, Railroad Industry

Standard Practices, and Generally Accepted Accounting Principles."  (*Id.* § 4)  From the MSA, it

appears that RAS was otherwise free to ensure performance of the contract services as it saw fit.

Pressed to defend its conclusion that an agency relationship exists, the Plaintiffs primarily

rely on the use of the word "agent" in Section 3 of the MSA and invoices (Dkt. No. 66, Opp. to

12(c) Motion, at pp. 3, 6), ignoring their own observation that courts look at the overall character

of the agreement, rather than simply whether the word "agent" is used.  (*Id.* at p. 9 (quoting

Restatement (Third) of Agency § 1.02)); *see also Pan Am. World Airways, Inc. v. Shulman

Transp. Enters., Inc. (In re Shulman Transp. Enters., Inc.)*, 744 F.2d 293, 295 (2d Cir. 1984) ("A

debtor does not become the agent of his creditor simply because he is called an agent." (citing

*Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 354 (1922))).  Plaintiffs also note

that the MSA (a) denotes the various services RAS is obligated to provide (Dkt. No. 66 at p. 3–

4), (b) specifies pricing for those services, and (c) does not expressly provide for RAS to keep a

portion of the fees it collects from lessees or of the service payments it collects from the

Plaintiffs (ostensibly because RAS earns its fee for its services through the management fee).

But it's not completely clear how these provisions establish an agency relationship or why they

amount to anything beyond a typical services contract.  Did those provisions give the Plaintiffs

control over the "method or manner" by which RAS paid railroads or arranged for Infinity

railcars to be repaired?  Did they give RAS the power to render Plaintiffs liable for any claims

(from providers of the services RAS arranged, for example)?  Plaintiffs don't specifically allege

that they do—and under the caselaw these seem the key questions they would need to answer to

win on the merits.  But I cannot force them to provide these details to pass the pleadings stage of

19

litigation if their theory, from the facts pled, is *plausible*, and I can't say it's implausible.  To the contrary, I think I am required by the pleadings standards to infer that the unpled factual inferences from these allegations are in Plaintiffs' favor—even though I doubt things will ultimately play out that way.  Indeed, the very nature of RAS's business, and the value-add it was created to provide, seems inconsistent with the concept of mere "agency."

VII.

Plaintiffs also allege that "notwithstanding" what the MSA says, in practice the Debtor "renders no payment to railroads and repair vendors on behalf of the Infinity Lessors unless and until the Infinity Lessors transfer sufficient funds to the Debtor in advance, which are specifically earmarked for payment to such vendors for specific repair services." (Compl. ¶ 21)  But the connection between this allegation and Plaintiffs' agency theory too is unclear.  What Plaintiffs describe in this section of the Complaint is a simple pre-funding mechanism—not *control* over which services are performed and how or by whom—that simply eliminates the risk that RAS's customers don't pay for the services it arranges, ensuring *RAS* is never left without funds to pay vendors.  Moreover, the parties appear to agree that *all* customer payments (except CIT's) went in and out of the same bank account and RAS was not restricted in its use of funds at any time.  Indeed, the "float" that made it possible for funds to be stolen occurred because customers paid RAS well in advance of RAS remitting the payables owed to vendors or to their customers.  Moreover, Plaintiffs' own allegation that RAS was required to remit to the Plaintiffs funds it collected for them from other parties on a *monthly* basis (Compl. ¶ 23) seems to work against them—because RAS was not required to turnover collections immediately, *RAS* exercised control over the funds, which courts have found suggests a lack of an agency relationship.  *Greenfield Direct*, 171 B.R. at 858 (citing cases).  Indeed, that was RAS's purpose.

20

Plaintiffs also emphasize their allegation that they can trace specific funds paid to RAS shortly before the petition date to specific dollars RAS still holds.  (Compl. ¶ 46)  But it isn't clear how that fact, assumed true, would mean that RAS holds those funds only as an agent. That fact, assumed true, is only a function of timing given the relatively short period between when those specific payments were made to RAS and the date the music stopped.  Moreover, RAS apparently received prefunding from *all* railcar owners before paying repairmen, so Plaintiffs' claimed ability to trace certain dollars in the common RAS account on the petition date because those dollars entered the account in the days before (and thus weren't spent) would neither turn an otherwise typical debtor/creditor relationship into an agency or fiduciary trust relationship nor substantively help Plaintiffs unless they were the *only* customers able to trace. To analogize to a more familiar relationship, Plaintiffs' allegations seem akin to a *homeowner* who pays a general contractor in advance and then seeks recompense when renovations are left incomplete—except RAS, unlike many licensed home-construction contractors, was neither obligated to maintain a performance bond nor segregate the funds advanced by Plaintiffs.  *Cf.* 735 I.L.C.S. 5/13-214 (which does not create a statutory lien in favor of homeowners, but rather notes remedies for construction issues are based on "tort, contract, or otherwise").

VIII.

Plaintiffs are correct that "[t]he pleading standard is not exacting."  (Dkt. No. 66, at 5) Plaintiffs must only identify facts that, combined with any reasonable inferences that I can make from the pleaded facts, if ultimately proven at trial, could plausibly demonstrate that specific dollars present in RAS's account are not property of the estate but instead property of the Plaintiffs in which RAS had "only legal title and not an equitable interest" as of the petition date per 11 U.S.C. § 541(d).

21

The MSA provides for RAS to collect and remit funds on the Plaintiffs' behalf, and RAS had to provide detailed receipts, but those provisions by themselves would not elevate an agreement above a garden-variety contract without something more. *See Cumis Ins. v. Peters*, 983 F. Supp. 787, 796–97 (N.D. Ill. 1997) (finding that allegations of the principal's "control" over the agent's performance of its obligations under the contract met the need to allege "more than a mere contract or simple trust" to survive a motion to dismiss). Plaintiffs' most important allegations relate to whether they actually had "control" over RAS, as that element is the "constant," "cardinal consideration" in determining if an agency relationship exists. *Bilek*, 8 F.4th at 588; *Kolchinsky*, 949 F.3d at 1013. And that is where Plaintiffs appear weakest; they must do much better at trial than in this Complaint to succeed. But at this stage of the case I must make inferences from the facts pled that suggest *some* indicia of control. And, again at this stage of the case *only*, it is possible that evidence like the one invoice attached to the Complaint could cause me to interpret Section 3 of the MSA in a way that would show agency. I cannot get there yet, but that outcome, based on the parties' relationship in its entirety, is plausible.

So while I agree with much of the Committee's position, I do not agree with the Committee that the Complaint and its exhibits establish that the Plaintiffs are not entitled as a matter of law to a declaration that the funds at issue are outside the estate, and I find that the Complaint rises above mere speculation in alleging that an agency relationship existed (though barely). A party does not have to allege all or even many facts in their complaint, and to pass Rule 12 muster, they only must plead enough to suggest a plausible inference that they *could* meet all the elements of their claim. Because an agency relationship is plausible, and because it is possible (albeit unlikely) that Plaintiffs could squeeze into the Seventh Circuit authority on 11 U.S.C. § 541(d) that all parties thus far have ignored, I cannot dismiss the case at this time.

IX.

The Complaint also includes a reference to the Plaintiffs transferring money to RAS "in trust," but does not elaborate. (Compl. ¶ 1)[7]  As described above, a debtor would lack equitable title to property if it holds the relevant property only in trust.  *Marrs-Winn Co.*, 103 F.3d at 589. Trust proceeds "can only be distributed to trust beneficiaries, and not to the creditors of the bankruptcy estate." *Id.*; *see Grede*, 867 F.3d at 783 ("Only property of the estate could and should be distributed pro rata to creditors. Property belonging to others must be returned to them.").  But as described above, the common link among the cases finding that property is held in trust and outside the estate is the clarity of the trust relationship governing the property in question.  *Compare Ryan*, 55 F.4th at 1108 (trust established by the express terms of a settlement agreement and order), *Grede*, 867 F.3d at 771–72 (trust created by operation of statute even though the debtor misappropriated or comingled the funds in violation of the statute), and *Marrs-Winn*, 193 B.R. at 496–98 (contract "clearly expresses both the intent to establish a trust and the terms of the trust") *with Lord's*, 356 F.2d at 457 (although parties' contract provided that funds would be held in trust, because the receipts were all commingled and the contract permitted commingling, the parties had a debtor/creditor rather than a fiduciary trust relationship).

As in agency law, the question of whether a trust exists looks at "whether the settlor manifested an intention to create the kind of relationship which to lawyers is known as a trust, whether the settlor manifested an intention to impose upon himself or upon a transferee of the property equitable duties to deal with the property for the benefit of another person." *Lord's*, 356

---

[7]  The concepts of agency and trusts are distinct, if often overlapping.  *See In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 617 (Bankr. S.D.N.Y. 2002) *aff'd* 144 F. App'x 900 (2d Cir. 2005) ("Where there is an agent-trustee, it is the agency relation that predominates, and the principles of agency, rather than the principles of trust, are applicable." (citing I Austin Wakeman Scott & William Franklin Fratcher, The Law of Trusts § 8, at 95 (4th ed.1987))); Restatement (Third) Of Agency § 1.01 (2006) ("Trustees may also be agents, depending on the presence of a right of control and a right to dispose of property.").

23

F.2d at 458.  If Plaintiffs allege a "special trust" that protects their money, the Seventh Circuit,

applying Illinois law, has made clear such relationships only exist in limited circumstances.

"[S]tate and federal courts in Illinois have rarely found a special trust relationship to exist in the

absence of a more formal fiduciary one." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571

(7th Cir. 2012) (citing cases, including *Benson v. Stafford*, 941 N.E.2d 386, 403 (Ill. App. Ct.

2010) (holding that the standard for identifying a special trust relationship is "extremely similar

to that of a fiduciary relationship")).  As pled, these parties do not appear to have something akin

to the sort of "attorney-client or doctor-patient relationship" that would create a formal fiduciary

relationship.  *Doe v. Boy Scouts of Am.*, 66 N.E.3d 433, 457 (Ill. App. Ct. 2016).[8]

That's another reason that Plaintiffs have an uphill battle here.  Much of the MSA

describes what appear to be typical commercial counterparties, not fiduciaries, and "where

parties capable of handling their business affairs deal with each other at arm's length, and there is

no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged

servient party, no fiduciary relationship will be deemed to exist." *State Sec. Ins. Co. v. Frank B.*

*Hall & Co.*, 630 N.E.2d 940, 947 (Ill. App. Ct. 1994).  Plaintiffs only squeak past a low standard

at the pleadings stage for the reasons stated earlier in this opinion.

X.

Count II of the Complaint is titled "Constructive Trust" and basically asks me to take the

funds in RAS's possession that Plaintiffs claim they can trace to themselves and place them in a

---

[8]    *See also Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 785 (7th Cir. 2015) (party serving as escrow agent for a
mortgage was not the fiduciary of the payee) (despite contract, plaintiff "has not plausibly alleged that
CitiMortgage assumed any additional, extra-contractual duties of a fiduciary nature"); *Media Bank, LLC v.
SCOTTeVEST, Inc.*, No. 19-cv-2465, 2020 WL 6825691, at *10 (N.D. Ill. Nov. 20, 2020) (advertising manager
was not fiduciary of clients for which it placed adds) ("Lots of contracts involve disparities in sophistication and
expertise. That's one of the reasons why parties enter into contracts in the first place – to benefit from someone
else's greater knowledge or skills.  A contract to benefit from someone else's expertise, without more, is not
enough to give rise to a fiduciary relationship.") (citing *Peterson v. H & R Block Tax Servs., Inc.*, 971 F. Supp.
1204, 1215 (N.D. Ill. 1997)).

constructive trust for Plaintiffs' sole benefit.  Plaintiffs allege that RAS is in possession, custody, and control, of property belonging to them, and that the "funds in possession of the Debtor which belong to the Infinity Lessors are identifiable and traceable."  (Compl. ¶ 54)  They contend that permitting RAS to use what they see as their property to make distributions to other creditors, pay bankruptcy costs, or both would result "in unjust enrichment" to others, and they seek an order imposing a constructive trust and enjoining RAS from using such funds.  (*Id.* ¶¶ 55–56)

As the Committee notes, I have previously held that "constructive trust" is a remedy and not a stand-alone cause of action.  *Graft*, 2025 WL 45085, at *5 (citing *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 304 (7th Cir. 2014)).  Plaintiffs cite nothing that would change my view.  Instead they pejoratively call the Committee's request to dismiss the claim "pointless" (Dkt. No. 66 at 14) because, in their words, "the remedy of a constructive trust would be available here even if the Infinity Lessors had not requested it in their Complaint."  (*Id.*)

I agree that if Plaintiffs ultimately demonstrate that funds held by RAS are not property of the estate, I could employ the remedy of a "constructive trust" to ensure those funds were returned to their rightful owner—whether or not it was pled as a separate cause of action.  Indeed, in *Mississippi Valley Livestock*, the Seventh Circuit reversed a Bankruptcy Court's decision and directed it on remand to consider the possibility of a constructive trust being imposed on specific property, while providing commentary on the possibility of "tracing funds in a commingled account."  745 F.3d at 307–09.  Because I am giving Plaintiffs "the opportunity to make [their] case," *Federated Mut.*, 983 F.3d at 313, it only makes sense to keep Count II alive for now—as it would be a potential remedy if Plaintiffs can ultimately succeed on Count I.  For these reasons, I decline to dismiss Count II at this time.

XI.

That leaves Count III, Plaintiffs' request for an accounting. "To state a claim for equitable accounting under Illinois law, a plaintiff must allege that they have no adequate remedy at law *and* one of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." *Neurodegenerative Disease Rsch., Inc. v. Nw. Univ.*, No. 25-CV-02775, 2025 WL 3171287, at *6 (N.D. Ill. Nov. 13, 2025) (emphasis added).

The Committee is correct that Plaintiffs' claim for an accounting duplicates the discovery process that is presently occurring (and the claims reconciliation that will have to be done for the debtor to advance this chapter 11 case). The claim itself adds nothing. But the filing of this suit would render inappropriate any request for relief under Federal Rule of Bankruptcy Procedure 2004, and Plaintiffs are surely entitled to this information. Moreover, for the same reasons that it makes no sense to dismiss Count II at this time, it makes no sense to dismiss Count III right now, either. Plaintiffs will no doubt receive the information sought here as part of this litigation.

XII.

For the reasons stated herein, the Committee's motion for judgment on the pleadings (Dkt. Nos. 54) is denied. At the status conference on Monday, February 9, 2026, I intend to set a trial date and to discuss with the parties the discovery needed to reach a final resolution of this matter given the issues remaining in this bankruptcy case. The trial date will be near-term. To give all parties and all other stakeholders in this bankruptcy advance notice and (hopefully) comfort, I intend to keep the parties to this lawsuit on a tight leash, consistent with Federal Rule of Civil Procedure 26(b)(1) (and Federal Rule of Bankruptcy Procedure 7026), and I will limit discovery to what is "proportional to the needs of the case." I will not permit anyone to exhaust the remaining proceeds of this estate fighting over which creditors should get them.

A separate order will issue.

Signed:   February 6, 2026                By:   _____

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE